Richard MORALES, Plaintiff,

v.

**QUINTILES TRANSNATIONAL CORP. and David Smith, Defendants.**

No. 96 Civ. 4021(RO).

United States District Court, S.D. New York.

July 31, 1998.

Order Denying Reconsideration November 19, 1998.

David Lopez, Southampton, NY, for Plaintiff.

Saul B. Shapiro, Douglas J. Widmann, Patterson, Belknap, Webb & Tyler LLP, New York City, for Defendants.

## MEMORANDUM

OWEN, District Judge.

Plaintiff, a stockholder in Quintiles Transnational Corp., alleges a violation of § 16(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78p(b) by defendant David Smith, a Quintiles insider in 1994–96, *see Blau v. Lamb*, 363 F.2d 507, 514 n. 6 (2d Cir.1966).[1] Plaintiff and defendant both move for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.

In 1994, Smith set up a trust[2] for his daughter Andrea, funding it with Quintiles stock.[3] This trust was to pay him in a prefixed annuity over three years. This annuity would amount to a total repayment of the initial value of the corpus of the trust, with the idea that if at the end of the trust's three-year life there had been any appreciation in value of the corpus, that appreciation would go to his daughter as a tax-free gift.[4] Smith had the right during the life of the trust to get the Quintiles stock back by "substituting other property of equal value." This he did in October of 1995, substituting for the Quintiles stock a promissory note in a face amount which was the then-market val-

---

1. Section 16(b) provides that a shareholder may bring suit "if the issuer shall fail or refuse to bring such suit within sixty days after request." 15 U.S.C. § 78p(b). Pursuant to that provision, in March of 1996, counsel for plaintiff sent a letter to Quintiles Transnational Corp., identifying the transaction which he alleged violated § 16(b). In a letter dated May 24, 1996, Quintiles informed plaintiff that it had "determined that pursuing recovery against Dr. Smith is not in the best interest of Quintiles." This action followed.

2. The trustees were Smith himself and one Leslie Lammers.

3. There were a number of identical trusts for all his daughters, individually and collectively, but for purposes of this opinion's discussion, I am going to focus on the trust for Andrea.

4. The trusts were of a type known as "zero-GRATs" because they were structured to be zeroed out by payments over a three-year period, absent a certain appreciation in value of the corpus; the terms of the GRATs provided that Smith was to receive an annual payment of a specified percentage of the value of the corpus at the time the GRATs were created. Thus, Smith was to receive 31.690% of the fair market value of the original trust corpus at the end of one year's time, 38.028% at the end of the second year, and 45.633% at the end of the third year. At the end of three years' time, the GRATs would terminate, and any remaining principal (resulting from an increase in the value of the Quintiles stock) would go to the remaindermen. Each GRAT named another trust to receive the remainder. Three of the GRATs provided for any remainder to go into three respective trusts, each for the benefit of a different one of Smith's five daughters; each of these GRATs was funded with 15,000 shares of Quintiles stock. The fourth GRAT, which was funded with 11,000 Quintiles shares, provided for the remainder to go into a trust for the benefit of Cedar Tree Neck Farm Corporation, a corporation owned by Smith's five daughters.

ue of Quintiles stock.[5] The following month, November, the Quintiles stock was split two-for-one, and in February of 1996, Smith sold on the open market a substantial amount of his Quintiles reacquisition at a profit (which, from all the trusts, totalled $1,400,127,75).[6]

The purpose of § 16(b), which permits recovery to a corporate issuer of insider trading profits made within a six-month period, is to discourage corporate insiders from engaging in short-term trading based upon inside information. It is irrelevant what an insider's intent may be in trading on a short swing. Accordingly, the only disputed issue here is whether Smith's reacquisition of Quintiles stock from the trust in 1995 was or was not a "purchase." By application of the principles underlying *Blau v. Lamb*, 363 F.2d 507 (2d Cir.1966), the answer is compelled that it *was* a purchase and that § 16(b) applies. While *Lamb* held that, in that case, it was not a purchase or sale where a corporate insider holding preferred stock with the right to convert to common exercised that right, Judge Waterman, writing for the court, did observe the following:

> To hold otherwise would be to place entirely undue stress on the corporate fiction reaching harsh and wooden results quite unnecessary to achieve the purposes of the act. *Until, going beyond the corporate forms, some new individuals entitled to share in the ultimate profits enter the picture there has been no real sale of stock.*

*Lamb*, 363 F.2d at 526 (quoting *Blau v. Mission Corp.*, 212 F.2d 77, 80 (2d Cir.1954) (emphasis supplied).

Here, however, Smith's action was not the mere exercise of conversion rights on terms established all along, but required a determination at the time of retaking of the market price of the stock and the substitution thereof of something of equal value of that amount.[7] In any event, since Smith had to pay then-present-market price for the right

to reacquire the Quintiles stock, it is obvious that this was a "purchase" from the trust, which was the "new individual," *see Lamb, supra*, entitled to share in the appreciation of the stock by reason of the stock split.

Accordingly, having concluded that Smith's pulling the Quintiles stock out of Andrea's trust was a purchase, its sale at a profit within six months thereafter is within the intended reach of § 16(b), which is to curb the possibility of abuse flowing from insider trading.

I turn, therefore, to the calculation of the amount to be disgorged as to all the trusts. There is no dispute as to the amount Smith paid in reacquisition of the GRAT shares or the amount for which they were sold. Smith reacquired 48,992 pre-split shares for $63 per share; thus, after the split, the purchase price of each pre-split share is deemed to be $31.50 for profit-calculation purposes. *See Lamb*, 363 F.2d at 527. After the split, Smith sold 10,000 for $67.75 per share, 5,000 for $67.875 per share, 9,313 for $68.25 per share, and 15,000 for $66.00 per share. Thus, matching shares purchased against shares sold, Smith's profit was $362,500.00 on the first sale, $181,875.00 on the second sale, $342,252.75 on the third sale, and $517,500.00 on the fourth sale, for a total of $1,404,127.75.

Defendant's motion for summary judgment is denied, and plaintiff's motion for summary judgment is granted. Defendant Smith is directed to surrender profits in the amount of $1,404,127.75 to the issuer, Quintiles Transnational Corp.

Submit order on notice.

## MEMORANDUM AND ORDER

OWEN, J.

Plaintiff Richard Morales, a stockholder in Quintiles Transnational Corporation ("Quintiles"), alleged a violation of

---

**5.** The total number of shares reacquired from all the trusts was 48,992 shares.

**6.** Those sales were: (1) 10,000 shares for $67.75/share on February 27, 1996; (2) 5,000 shares for $67.875/share on February 28; (3) 9,313 shares for $68.25/share on February 28; and (4) 15,000 shares for $66.00/share on February 29.

**7.** Indeed, it is little different than if Smith had gone in the open market and bought the stock directly (except that he could not have done that with a promissory note).

§ 16(b) of the Securities Exchange Act of 1934, codified at 15 U.S.C. § 78p(b), by defendant David Smith, a Quintiles insider in 1994–96. Both parties moved for summary judgment. I granted plaintiff's motion and denied defendants' motion. *See Morales v. Quintiles Transnational Corp.*, 25 F.Supp.2d 369 (S.D.N.Y.1998). Defendants move for reconsideration. *See* Fed.R.Civ.P. 59(e), Local Rule 6.3. To prevail, they must demonstrate "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *Doe v. New York City Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir.1983). This review is narrow and applies only to already-considered issues; new arguments and issues are not to be considered. The motion is not a substitute for appeal and "may be granted only where the Court has overlooked matters or controlling decisions which might have materially influenced the earlier decision." *Enzo Biochem, Inc. v. Johnson & Johnson*, 866 F.Supp. 122, 123 (S.D.N.Y.1994) (citations omitted); *Schonberger v. Serchuk*, 742 F.Supp. 108, 119 (S.D.N.Y.1990).

Here, defendants have not offered any controlling law that undermines the initial Order, nor any new factual matters. Defendants' motion is based upon a Securities and Exchange Commission ("SEC") No-Action Letter construing Section 16a of the Securities Exchange Act of 1934, which was called to my attention before. The defendants claim it is "virtually on all fours" with the instant case. It is not.

The No-Action letter addressed a trust which was to make payments of a fixed amount at fixed intervals. *See Peter J. Kight*, SEC No-Action Letter, Fed. Sec. L. Rep. (CCH) ¶ 77,403 (October 16, 1997). Under the terms of that GRAT, these payments might be made in either cash or stock, at the option of the trustee. The time and dollar amount of the payments were fixed at the time of the initial transfer to the GRAT. The number of shares to be transferred in payment was only to equal the specified dollar amount as determined by the fair market value of the shares on said payment date,

and neither the grantor nor the trustee had any discretion. *See id.* More importantly, however, the creator of the GRAT represented to the SEC that "the creation of the GRAT and the annuity payments would provide no opportunity for any abuse of inside information." *Id.* Conversely, by the terms of this GRAT, grantor David Smith "had the right [at any time] during the life of the trust to get the Quintiles stock back by substituting other property of equal value," *Morales v. Quintiles*, 1998 WL 436359 at *1, which he did by substituting a promissory note. Therefore, the "opportunity" existed for Smith to abuse inside information by substituting property of equal value to get the GRAT shares back just before the shares appreciated drastically. The *Kight* letter is therefore inapplicable here.

Moreover, this No-Action letter does not rise to the level of a "controlling decision" which might make reconsideration appropriate because "rules announced in no-action letters . . . have no binding authority." *New York City Employees' Retirement System v. SEC*, 45 F.3d 7, 14 (2d Cir.1995). Accordingly, defendants motion for reconsideration is denied.

The foregoing is so ordered.