725 So.2d 533 (1998)
TRI-MILLENNIUM CORPORATION, BBC Entertainment, Inc.
v.
JENA BAND OF CHOCTAW INDIANS, et al.
Nos. 98-CA-612, 98-C-532.
Court of Appeal of Louisiana, Fifth Circuit.
December 16, 1998.
Rehearing Denied January 25, 1999.
Donald S. Wingerter, Baton Rouge, Louisiana, Attorney for Defendants/Appellants.
Joel T. Chiasson Chaisson & Chaisson, Destrehan, Louisiana, and Catherine Leary, Westwego, Louisiana, Attorneys for Plaintiffs/Appellees.
*534 Panel composed of Judges SOL GOTHARD, MARION F. EDWARDS, and SUSAN M. CHEHARDY.
GOTHARD, Judge.
This matter arises from business negotiations involving the plaintiffs, Tri-Millennium Corporation (Tri-Millennium) and BBC Entertainment, Incorporated (BBC), and the defendants, the Jena Band of Choctaw Indians (Jena Tribe), and various members of the Jena Tribal council. The purpose of the negotiations was to develop and operate a gaming facility on land to be purchased by the Jena Tribe. In furtherance of that purpose, the parties executed three documents between March, 1996 and March, 1997 namely, Memorandum of Understanding, Development Agreement, and Term Sheet. A disagreement arose and plaintiffs filed an action for breach of contract and fraud. Defendants filed several exceptions including lack of subject matter jurisdiction, no cause of action, improper cumulation of actions, and improper venue. Plaintiffs filed a Motion for Preliminary Injunction seeking to enjoin the Jena Tribe from negotiating with other potential investors, and for damages.
According to the allegations in the petition and the arguments of counsel at the hearing, the Jena Tribe is a sovereign nation recognized by the Federal government in 1995. Although it is entitled to a reservation, it owns no land. Plaintiffs intended to provide financing for the Jena Tribe to acquire land upon which to construct a gambling casino. As consideration for the financing, plaintiffs would get an interest in the casino. Plaintiffs expended monies for land options, environmental permits and monthly stipends to the Jena Tribe. The plaintiffs assert that the Jena Tribe accepted the stipends and allowed the expenditures in bad faith, never intending to actually purchase land for the project.
After a hearing on all pending matters, the trial court rendered judgment denying the Jena Tribe's exceptions and granting the plaintiffs' request for preliminary injunction. Defendants filed a writ in this Court seeking review of the denial of the exceptions,[1] and an appeal from the grant of the injunction. In the interest of judicial economy, the two matters were consolidated for review in this Court.[2]

INJUNCTION
At the hearing the trial court heard arguments of counsel with regard to the exceptions, and testimony in the consideration of the injunction. Chief Jerry Jackson of the Jena Tribe testified that his tribe signed the agreements in question and accepted stipends from the defendants. However, Chief Jackson maintains the stipends were not paid in accordance with the agreement. Chief Jackson terminated the contract with defendants and began negotiations with a third party who is currently paying a stipend to the tribe. The Chief acknowledged that since 1991 the tribe has accepted over $600,000.00 from individuals who hoped to do business with the tribe should it be successful in gaining Federal recognition. Chief Jackson stated that he came to Jefferson Parish to sign the agreement with defendants and also brought the tribal council down to the Treasure Chest Casino in Jefferson Parish. Chief Jackson admitted that a contract may be signed with a third party within a week of the hearing. After hearing the testimony and considering the arguments of counsel, the trial court granted plaintiffs' motion for preliminary injunction enjoining the Jena Tribe from "engaging in any negotiations or making any agreements or contracts for the development or management of a gaming facility on land to be purchased at a later date". In support of the judgment the trial court gave extensive written reasons.
LSA-C.C.P. article 3601 provides that a preliminary injunction may by issued during the pendency of an action for a permanent injunction on a prima facie showing that the petitioner will prevail on the merits and that the potential losses are those for which money damages are inadequate or are incapable of measurement by pecuniary standards. Shaw v. Hingle, 94-1579 (La.1/17/95), 648 *535 So.2d 903, 905; Metro Riverboat Associates, Inc. v. Bally's Louisiana, Inc., 97-1672 (La. App. 4 Cir. 1/14/98), 706 So.2d 553, 558-9. In order to obtain a preliminary injunction, a plaintiff must show that he will suffer irreparable harm if the injunction is not granted, that he is entitled to relief sought, and he must make a prima facie showing that he will prevail on the merits. Lafreniere Park Foundation v. Friends of Lafreniere Park, Inc., 97-152 (La.App. 5 Cir. 7/29/97), 698 So.2d 449, 452, writ denied, 97-2196 (La.11/21/97), 703 So.2d 1312.
Using that standard, we find that the circumstances warranted the grant of the preliminary injunction in this case. Chief Jackson testified that his tribe was involved in serious negotiations with a third party and may sign a contract within the week which would have eliminated plaintiffs' chances to demand specific performance of the contracts signed with the tribe. Further, we believe the trial court was correct in finding the plaintiffs have made a prima facie showing that they would prevail on the merits. Accordingly, we affirm the judgment of the trial court in so far as it grants the preliminary injunction.

EXCEPTIONS

NO CAUSE OF ACTION
In the exception of no cause of action, the Jena Tribe argues that the contracts need approval of the Bureau of Indian Affairs to be valid; and because they lack that approval, the contracts are null and void. Therefore, plaintiffs have no cause of action for breach of contract.
Plaintiffs/developers counter that the development agreement is a collateral agreement which does not require federal approval to be valid. They assert the agreement is not relative to Indian lands so as to trigger the need for approval of the Bureau of Indian Affairs (BIA).
The Tribe bases its argument on 25 U.S.C. § 81 which reads in pertinent part as follows:
No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, for the payment or delivery of any money or other thing of value, in present or in prospective, or for the granting or procuring any privilege to him, or any other person in consideration of services for said Indians relative to their lands, or to any claims growing out of, or in reference to, annuities, installments, or other moneys, claims, demands, or thing, under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States, unless such contract or agreement be executed and approved as follows..........
That statute also declares that contracts and agreements made in violation of the statute are null and void. The statute results from a law passed by Congress in 1872 which was "intended to protect the Indians from improvident and unconscionable contracts." In re Sanborn, 148 U.S. 222, 227, 13 S.Ct. 577, 579, 37 L.Ed. 429(1893); Altheimer & Gray v. Sioux Mfg. Corp., 983 F.2d 803 (7th Cir. 1993), cert. denied, 510 U.S. 1019, 114 S.Ct. 621, 126 L.Ed.2d 585 (1993).
In Altheimer, supra, the Sioux Manufacturing Corporation (SMC), a wholly-owned tribal corporation with its sole facility and offices on tribal land, contracted with Medical Supplies & Technology, Inc. (MST) to manufacture and market latex medical products at the tribal plant. MST sent a "Letter of Intent" to SMC in furtherance of the negotiations. The Letter contained provisions for the waiver of Tribal Sovereign Immunity, and submission to the venue and jurisdiction of federal and state courts should a lawsuit develop. The parties reached an impasse in their relationship and two lawsuits were filed, one in state court and one in federal court. The state matter was removed to federal court and consolidated with the pending federal matter. The federal district court granted an Indian motion for summary judgment, declaring the contract null and void for failure to obtain approval from the Bureau of Indian Affairs pursuant to 25 U.S.C. § 81. The appeals court overturned that ruling, finding that the contract was not relative to Indian lands as contemplated in the statute. In reaching that decision, the Altheimer court provided us with a thoughtful discussion on the modern day interpretation *536 of 25 U.S.C. § 81 and the validity of contracts between non-Indians and Indians when tribal lands are involved. The court concluded that four factors are important in the determination of whether a management contract is relative to Indian lands. They are:
1.) Does the contract relate to the management of a facility to be located on Indian lands?
2.) If so, does the non-Indian party have the exclusive right to operate that facility?
3.) Are the Indians forbidden from encumbering the property?
4.) Does the operation of the facility depend on the legal status of an Indian tribe being a separate sovereign?
Using those factors, the Altheimer court did not find the contract at issue related to Indian lands and reversed the district court.
In the instant matter the parties executed a Memorandum of Understanding on March 14, 1996 which states that the parties:
"are desirous of entering into a Financing Agreement whereby Jena Choctaw would obtain from the Lender necessary funds to attempt to secure a state compact from the State of Louisiana under the Indian Gaming Regulatory Act and to acquire and develop and transfer into federal trust status a certain parcel of real estate in Louisiana for a Gaming Operation".
Further, that document indicates that the loan proceeds, which are stated to be $34,000,000.00, are to be used for the purchase of land, construction costs of a casino, and all necessary licenses and fees. Also contained in the document are the following pertinent provisions:

SECTION 6PROPERTY ACQUISITION
Jena Choctaw shall obtain property sufficient in size, topography and all other geographic or environmental aspects for the development of the Gaming Operation. Lender shall have the right to approve the designation of the Property as well as the terms and conditions for the acquisition of the Property. If Lender determines that a parcel of property is unacceptable, Lender will provide evidence to support its objections. Title to the Property must vest in Jena Choctaw, or in the United States for the benefit of Jena Choctaw, free of any lien or other encumbrance, except easements, restrictions, and other encumbrances satisfactory to Jena Choctaw. As a condition of the acquisition of the Property, the Property must receive necessary approval from state and federal authorities for the acquisition and development of the Property for purposes herein contemplated. Jena Choctaw's present intention is to acquire the Ballina Farms Property located in Alexandria, Louisiana, under a certain Option to Purchase Agreement between Jena Choctaw and James Moody, dated January 5, 1996.

SECTION 9MANAGEMENT AND OPERATIONS
Lender shall have no right to manage or operate the Gaming Operation, provided that Jena Choctaw shall, as an operating expense of the Gaming Operation, engage the services of an experienced management consultant in order to assure that management and operations on the Facility shall be conducted in a first class manner.

SECTION 12SOVEREIGN IMMUNITY WAIVER
Jena Choctaw hereby waives its immunity from unconsented suit for the purpose of enforcing the terms of this Agreement in a court of competent jurisdiction.
On October 18, 1996, the parties entered into a Development Agreement which also included JBC Management, an enterprise chartered by the Jena Tribe, and BBC Entertainment, a Minnesota corporation which is referred to collectively with Tri-Millennium as the developer. That document contains provisions which make it clear that the Tribe owns no land and will use some of the monies expended by the developers to purchase land. The document also provides that title to the land when purchased, will vest "in the Tribe or in the United States of America for the benefit of the Tribe, free of *537 any lien or other encumbrance, except easements, restrictions and other encumbrances satisfactory to Developer and Tribe". The document also provides that the application for approval of the Bureau of Indians Affairs will begin within five business days after closing on the land purchase. The Tribe again waives sovereign immunity, agreeing that it "will not assert the defense of sovereign immunity if sued for any tort or breach of contract or relative to any arbitration proceedings, or relative to any other legal action to enforce the terms of its agreements with any of the other parties hereto, their successors and assigns, or to enforce any rights created by this Agreement and all other agreements contemplated hereby".
Also relevant to our discussion is Indian Gaming Regulation Act embodied in 25 U.S.C. § 2701 et seq. After the signing of the Development Agreement, the Jena Tribe wrote to the National Indian Gaming Commission (NIGC) requesting a ruling on whether the agreement constituted a management contract for which NIGC approval was required. A letter from the NIGC in response to that request is contained in the record. In that letter Harold Monteau, Chairman of the National Indian Gaming Commission considers the development agreement and the issue of the necessity for approval. Chairman Monteau thoroughly reviews the terms of the agreement, and Federal Indian Gaming Law and its applicability to the development agreement. He concludes that "under 25 U.S.C. § 2711 and 25 C.F.R. §§ 502.5 and 502.15 the Development Agreement is, at minimum, a collateral agreement to a management contract and requires the approval of the NIGC. Thus, the Tribe and the Developer must submit both the Development and the Management Contract to the NIGC for approval". The letter does not mention 25 U.S.C. § 81 or the necessity for BIA approval.
On June 26, 1997 the Jena Tribe sent to the partnership of Tri-Millennium and BBC Entertainment a "Final Gaming Proposal" which offers the following terms:
1. The Jena Band of Choctaw Indians offers 5% of the total net profit of the Tribe future gaming revenue in exchange for a $1 Million dollar loan to the Tribe.
2. The Loan shall be paid back over 84 months, beginning upon the start of activities, at a 8% simple interest rate. The loan shall consist of land and/or cash.
3. A $100,000.00 good faith payment will be due upon the signing of a term sheet. The remaining $900,000.00 shall be placed in an established trust account, under all participants' names. These funds shall be used for the purchase of land. Titles after purchase will be placed in the trust account.
4. Simultaneously with the signing of a Class II & Class III Management Contract, in which the developers are given a 5% ownership, all clear titles to property purchased and any remaining cash, shall be transferred to the Tribe.
5. If the developer fails to transfer titles and/or cash to the Tribe, the Tribe will have the right to buy-out the developer's interest in this project for the trust account value.
In Rita, Inc. v. Flandreau Santee Sioux Tribe, 798 F.Supp. 586 (D.S.D.1992), the court found that a management agreement between the parties which had not been approved by either the BIA pursuant to 25 U.S.C. § 81, or the NIGC pursuant to 25 U.S.C. § 2711, while voidable, did not preclude the plaintiff from having the matter considered by the court. In that case a casino was open and operating on Indian land when a newly elected tribal council sought to oust the operator of the casino. The plaintiff/operator filed for a temporary restraining order or a preliminary injunction and for damages. The court held the injunctive relief was not proper, but retained jurisdiction over the matter and found that the Indians could not induce the plaintiff into investing in the project and accept money, without allowing the plaintiff a recourse for asserting its grievances.
We find the decision in Rita, Inc. v. Flandreau Santee Sioux Tribe, supra instructive. In that case the tribe had land and an operating casino. Clearly, federal approval was required for the contracts in that matter; *538 yet, the court acknowledged the right of the plaintiff to be heard in the absence of that approval.
Recently, in Mata v. Mata, 97-1214 (La. App. 5 Cir. 4/28/98), 712 So.2d 252 at 254, 253, writ denied, 98-1416 (La.6/24/98) 719 So.2d 483, this court discussed the purpose of the exception of no cause of action.
The function of an exception of no cause of action is to test the legal sufficiency of the petition by determining whether the law affords a remedy on the facts alleged in the pleading. No evidence may be introduced to support or controvert the objection that the petition fails to state a cause of action. LSA-C.C.P. art. 931. Therefore, the court reviews the petition and accepts well pleaded allegations of fact as true, and the issue at the trial on the exception is whether, on the face of the petition, the plaintiff is legally entitled to the relief sought. Citations omitted.
In the case at bar, we do not find that a determination of whether BIA approval was necessary at this point in the process is essential to the question of whether the plaintiffs have stated a cause of action for which a remedy exists. The Jena Tribe has no land, no license and no casino. Yet by its own admission it has accepted over $273,000.00 from the plaintiff for the purchase of land for the construction of a casino which has not yet come to pass. Part of the plaintiffs' claim is that the Tribe did not negotiate in good faith and did not use the money paid under the agreement for the purpose agreed upon. While we make no judgment on the merits of plaintiffs' claim, we believe the plaintiffs have stated causes of action which include conversion, unjust enrichment and fraud which can be addressed by the court, regardless of whether the contract will later prove to be void. Accordingly, we find no error in the trial court's ruling which denied the exception of no cause of action.

JURISDICTION
The Tribe also assets the trial court erred in denying its exception of lack of subject matter jurisdiction. In brief to this court, the Tribe argues that matter can only be heard in Federal court. The Tribe maintains that both the status of the Tribe, and the activity anticipated by the agreement are dependant on and governed by federal law. Thus, the state cannot exercise jurisdiction.
28 U.S.C. § 1331 provides that, "(t)he district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States". That provision does not give exclusive jurisdiction over Indian affairs to the federal district courts. The mere fact that an Indian Tribe is one of the parties in a contract does not establish federal question jurisdiction. Stock West, Inc. v. Confederated Tribes of the Colville Reservation, 873 F.2d 1221 (C.A.9 Wash.1989). Further, a case is not cognizable in a federal trial court, in the absence of diversity of citizenship, unless it appears from the face of the complaint that determination of the suit depends upon a question of federal law. Pan American Petro. Corp. v. Superior Court of Del., 366 U.S. 656, 663, 81 S.Ct. 1303, 1307, 6 L.Ed.2d 584 (1961). In that case the Supreme Court further explained:
But questions of exclusive federal jurisdiction and ouster of jurisdiction of state courts are, under existing jurisdictional legislation, not determined by ultimate substantive issues of federal law. The answers depend on the particular claims a suitor makes in a state court-on how he casts his action. Since `the party who brings a suit is master to decide what law he will rely upon'. The Fair v. Kohler Die & Specialty Co., 228 U.S. 22, 25, 33 S.Ct. 410, 411, 57 L.Ed. 716.
. . . . .
For this requirement it is no substitute that the defendant is almost certain to raise a federal defense.
Id.
In the matter before us, the plaintiff has made allegations of breach of contract, conversion, fraud, and unjust enrichment under Louisiana law. These claims do not arise under the Indian Gaming Regulatory Act. The fact that the Jena Tribe relies on federal law as a defense is not determinative of jurisdiction.
Further, we believe the trial court's finding that the Jena Tribe waived its sovereign immunity is sound. The provisions of both the Memorandum of Understanding and the Development Agreement clearly support that *539 conclusion. Accordingly, we find the exception of lack of subject matter jurisdiction was properly overruled.

VENUE
The Tribe also argues that venue in Jefferson Parish is improper. Pursuant to LSA-C.C.P. article 76.1 "(a)n action on a contract may be brought in the parish where the contract was executed or the parish where any work or service was performed or was to be performed under the terms of the contract". The record shows that the Jena Tribe, and individual defendants are all domiciled in La Salle Parish. Tri-Millennium has offices in Jefferson Parish. The petition alleges that the Development Agreement was signed in Jefferson Parish. The petition further asserts that the plaintiffs fulfilled their contractual duties and obligations in various locations, including Jefferson Parish. At the hearing, Chief Jackson testified that he and other tribal council members went to Jefferson Parish to sign the agreement, and to visit a casino. Based on these circumstances, the trial court found that venue was proper in Jefferson Parish. We see no error in that ruling.
For the foregoing reasons, the judgment of the trial court is affirmed. All costs of this appeal are assessed against appellants.
AFFIRMED.
NOTES
[1] 98-C-532 filed May 21, 1998.
[2] Consolidation by Order of this Court dated June 26, 1998.