CATSKILL DEVELOPMENT, L.L.C., Mohawk Management, L.L.C., and Monticello Raceway Development Company, L.L.C., Plaintiffs,

v.

PARK PLACE ENTERTAINMENT CORP., Defendant.

No. 00CIV8660CMGAY.

United States District Court, S.D. New York.

July 23, 2001.

Thomas Puccio, New York, NY, for Catskill Development.

William Hopson, John Gallagher, Stites & Harbison, Atlanta, GA, Marc D. Powers, Herbert Kozlov, Parker Duryee Rosoff & Haft, New York, NY, for Mohawk Management & Monticello Raceway.

Paul R. Verkuil, George Carpinello, Boies, Schiller & Flexner LLP, Albany, NY, Sill Cummis Radin, Tischman, Epstein & Gross, Newark, NJ (Steven R. Radin, Richard Epstein, of counsel), for Park Place.

## MEMORANDUM DECISION AND ORDER GRANTING PLAINTIFF CATSKILL DEVELOPMENT'S MOTION FOR RECONSIDERATION

MCMAHON, District Judge.

Plaintiff Catskill Development, LLC ("Catskill Development") asks that the Court reconsider its May 14, 2001 Memorandum Decision and Order granting in part and denying in part defendant Park Place's motion to dismiss. Specifically, plaintiff requests reconsideration of that portion of the May 14 decision in which I held that plaintiffs had failed to state a claim for tortious interference with one of the contracts at issue in the lawsuit, the Land Purchase Agreement.

For the reasons stated below, Catskill Development's motion to reconsider is granted, and upon reconsideration, the motion to dismiss the claim for tortious interference with the Land Purchase Agreement is denied.

## BACKGROUND

Catskill Development and the other plaintiffs in this suit—Mohawk Management, LLC ("Mohawk Management") and Monticello Raceway Development Co. LLC ("Monticello")—are members of a group of businessmen and developers (hereinafter the "Catskill Group") who, beginning in 1995, sought to build and operate a casino at a site adjacent to the Monticello Racetrack in Monticello New York. Because gambling is illegal in New York State except on Native American lands and under certain conditions, the Catskill Group partnered with the St. Regis Mohawk Tribe on the project.

The full history of the relationship between the developers and the Tribe is outlined in the May 14 decision. *Catskill Development LLC v. Park Place Ent. Corp.*, 144 F.Supp.2d 215 (S.D.N.Y.2001) (no page refs avail.). Catskill Development contends that I did not accurately describe plaintiffs' deal with the Tribe in that opinion, and that, once the inaccuracies are corrected, my conclusion that the Land Purchase Agreement is a voidable collateral agreement is demonstrably erroneous.

It appears that the Court was laboring under certain misapprehensions about the particulars of the various transactions. Plaintiffs are partly responsible for the Court's failure to understand fully the details of the project, since they submitted precious little background information and I had to glean what I could from project documents provided by the defendant. Plaintiffs have used this motion to fill in the gaps in their earlier papers. It now appears that the deal was structured as follows:

Plaintiff Catskill Development bought the Monticello Raceway in 1996 for $10 million, and set aside approximately 30 acres of that property for the casino. The

plan was to transfer these 30 acres to the U.S. Government to be held in trust for the Tribe, in exchange for which the Tribe would pay plaintiff Catskill Development $10 million in cash. This aspect of the project was set out in an amended and restated Land Purchase Agreement (hereinafter the "LPA"), executed between the plaintiff Catskill Development and the Tribe's Gaming Authority. The Tribe was to pay for the land with the proceeds of a loan, which the Tribe would obtain from a third-party lender, pursuant to a Leasehold Mortgage Agreement ("LMA").

The Catskill Group created a separate entity, plaintiff Monticello Raceway Development Co. LLC ("Monticello") to develop and build the casino and the real property surrounding the casino site. Plaintiff represents that Monticello is owned "by a minority of Catskill Development members." (See Pl. Brief in Supp. of Mot. for Reconsid. at 7.) The terms of Monticello's involvement were set out in another agreement, the Development and Construction Agreement, under which Monticello would receive a "development fee" of 5% of the costs of the development and construction. Monticello agreed to use commercially reasonable efforts to assist the Tribe in obtaining financing for the development, construction, and start-up of the casino.

The Catskill Group also created a third entity, plaintiff Mohawk Management, to manage, operate and maintain the casino for seven years. Plaintiff Catskill Development has a 50% voting interest in plaintiff Mohawk (the other 50% is controlled by Alpha Hospitality Corp. ("Alpha"), a publicly traded corporation). Under the Gaming Facility Management Agreement ("Management Agreement"), plaintiff Mohawk was to receive 35% of annual profits (net of debt service). Mohawk also agreed

to help the Tribe obtaining financing to build and operate the casino.

As plaintiff now makes clear, the activities of Mohawk Management under the Management Agreement were limited to those gaming activities defined under the Indian Gaming Regulatory Act (IGRA) as "Class III," which include (but are not limited to): table games (such as baccarat and blackjack), casino games (such as roulette and craps), slot machines, and electronic gaming terminals. See 25 U.S.C. § 2703(7)(A); 25 C.F.R. § 502.4. The Management Agreement did not cover Class II games (bingo, lotto, and games similar to bingo or lotto), which were to be managed by the Tribe. 25 U.S.C. § 2703(7); 25 C.F.R. § 502.4.

While the Tribe and plaintiff Mohawk were to operate the casino, plaintiff Catskill Development was to operate the adjoining racetrack facility separately. The Tribe was not to have any role in the operation of the racetrack. Thus, Catskill Development and the Gaming Authority also executed a Shared Facilities Agreement, to ensure that the racetrack and the casino would be properly maintained and repaired, and to allocate responsibility for the upkeep and repair of common areas.

Catskill Development argues that, in determining the validity of the separate agreements between the Tribe and the plaintiffs, the Court erroneously viewed the plaintiffs as a single entity and "commingled" the distinct rights and obligations of each of these the three plaintiffs, whom Catskill Development argues are "related but independently own and controlled." (Br. in Supp. of Mot. for Reconsid. at 6.) In their response to the motion to dismiss, plaintiffs did not bother to refer to the individual plaintiffs in discussing the separate agreements.[1] How-

1. For example: "Plaintiffs Catskill ..., Mo- hawk ..., and Monticello ... (all hereinafter

ever, as the complaint contains separate allegations of tortious interference with each of the four agreements, with the appropriate entity named as the party plaintiff, I agree that it was confusing to adopt plaintiffs' use of the amalgamated term "Catskill," and in this opinion I will take care to differentiate among the three plaintiffs. I note, however, that the individual plaintiffs do not operate as independently as Catskill Development now claims in the motion for reconsideration. In particular, I find disingenuous plaintiff's attempt to characterize the land transfer as a separate transaction by an independent entity (Catskill Development) whose post-closing involvement in the casino would be tangential or non-existent.

The casino project was subject to extensive federal and state regulatory oversight under the Indian Gaming Regulatory Act (IGRA), codified at 25 U.S.C. § 2701 et seq. First, before a Tribe can operate a gaming establishment on newly-acquired trust lands, the Secretary of the Bureau of Indian Affairs (BIA) has to determine that "a gaming establishment on the newly acquired trust lands would be in the best interest of the Indian tribe and its members, and would not be detrimental to the surrounding community," but only after obtaining the concurrence of the Governor of the State in which the casino will be built (in this case, New York's Governor Pataki). 25 U.S.C. § 2719(b)(1)(A).

In addition to BIA approval, plaintiffs had to obtain approval of the Management Agreement by the Chairman of the National Indian Gaming Commission (NIGC). *See* 25 U.S.C. §§ 2705(a)(4), 2710(d)(9), 2711. Furthermore, plaintiffs and the Tribe could not install Class III games such as electronic gaming terminals in the casino until the Tribe re-negotiated, through Governor Pataki, its gaming compact with the State.

As set out in detail in the May 14 opinion, plaintiffs were in the process of obtaining the necessary approvals when defendant convinced the Tribe to deal only with it on any casino projects in New York State. At the time defendant allegedly induced the Tribe to break with plaintiffs, the Secretary of the BIA had determined that the project could proceed. However, Governor Pataki had not yet concurred, and from documents submitted by the plaintiffs it appears that he was not likely to give this concurrence prior to successful renegotiation of the tribal-state compact. Thus, the BIA had not yet agreed to accept the land in trust for the Tribe, and the trust transfer had not yet occurred. Furthermore, the NIGC had not yet approved the Management Agreement.

Plaintiffs filed claims for tortious interference with contract, tortious interference with prospective business relations, unfair competition, and violations of New York's Donnelly Act. Defendant moved to dismiss plaintiffs' claim for tortious interference with contract on the grounds that none of the agreements executed between plaintiffs and the Tribe was a valid contract. Park Place argued that the lack of the

referred to as "Catskill")" (Mem. in Opp. to Def.'s Mot. to Dismiss at 1.); "On December 14, 1999, revised agreements with Catskill...." (Id. at 2.); "On March 10, 2000, BIA 'identified the remaining issues to be addressed by the Mohawks and Catskill'" (Id.); "The Land Purchase Agreement, Management Agreement, and Development Agreement are each enforceable contracts between Catskill and the Mohawks" (Id. at 8.); "In addition to the Land Purchase Agreement, Catskill and the Mohawks had other enforceable agreements with the Mohawks. The Management, Development and Facilities Agreement were enforceable preliminary agreements under which Catskill and the Mohawks again agreed to submit proposed agreements ...." (Id. at 14.)

necessary governmental approvals rendered the various agreements void.

In the May 14 opinion, I held that the Management Agreement was void under regulations passed pursuant to the IGRA which require that gaming management contracts not approved by the National Indian Gaming Commission (NIGC) are void and unenforceable. *Catskill,* 144 F.Supp.2d 215 (citing 25 C.F.R. § 533.7). *See also* 25 C.F.R. § 533.1 (stating that Class II and III management contracts "shall become effective upon approval by the Chairman [of the NIGC]").

As to the LPA, the Development and Construction Agreement, and the Shared Facilities Agreement, I held that each of these was also void. I found that each of these agreements were collateral to the Management Agreement, under the definition of "collateral agreements" under provided in 25 C.F.R. § 502.5. Under section 2711(a)(3) of the IGRA, collateral agreements are considered management contracts. Thus, because unapproved management contracts are void under C.F.R. §§ 533.1 and 533.7, I held that the collateral agreements were also void.[2] *See Catskill,* 144 F.Supp.2d 215 (citing 25 U.S.C. § 2711(a)(3) and *U.S. ex rel. Mosay v. Buffalo Bros. Mgmt.,* 20 F.3d 739, 743 (7th Cir.1994) (explaining effect of IGRA on contracts with Indian tribes)).

Catskill Development now moves for reconsideration of the Court's holding, albeit only with respect to the LPA.

1. Plaintiff's Motion For Reconsideration Is Granted

 To prevail on a motion for reconsideration, the movant must demonstrate "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *See Doe v. New York City Dept. of Soc. Servs.,* 709 F.2d 782, 789 (2d Cir.1983). The court's review "is narrow and applies only to already-considered issues; new arguments and issues are not to be considered." *See Morales v. Quintiles Transnational Corp.,* 25 F.Supp.2d 369, 372 (S.D.N.Y.1998). A motion for reconsideration "is not a substitute for appeal and 'may be granted only where the Court has overlooked matters or controlling decisions which might have materially influenced the earlier decision.'" *See id.* (citations omitted).

Plaintiff argues that I should not have deemed the LPA a "collateral agreement" to the management contract. I will not revisit this holding. The agreements at issue in this case were all closely related.[3] Provisions of each agreement either triggered or worked in conjunction with provisions in the others. In addition, Catskill Development or one of its affiliates was to

**2.** I also invalidated another document, the Leashold Mortgage Agreement, which I erroneously understood was to be executed between plaintiffs and the Tribe. Catskill Development notes that plaintiffs are not claiming that defendant tortiously interfered with this agreement, as it was to be executed between the Tribe and an unspecified mortgagee (who could not be identified until financing for the casino project could be arranged). Accordingly, that portion of the May 14 opinion which dismisses plaintiff's claim as to the Mortgage Agreement is vacated.

**3.** Contrary to plaintiff's contention, the fact that each agreement was signed by different parties does not change this fact. A collateral agreement may also be a contract "related ... to any rights, duties or obligations created between a tribe ... [and] any person or entity *related to* a management contractor." Clearly, the LPA is "related" to the "rights, duties or obligations" between the Tribe and plaintiffs. There is no question of the relationship between Mohawk Management and Catskill Development, as evidenced by Catskill Development's 50% interest in Mohawk.

receive some form of compensation under each agreement, an arrangement which defendant argues would have led the NIGC to consider the deal *in toto*.[4] *See* Approved Management Contracts v. Consulting Agreements, NIGC Bulletin No. 94–5, October 14, 1994 (noting in its guidelines that in order to determine whether or not a particular contract or agreement is a "management contract", the NIGC "must see the entire document including any collateral agreements and referenced instruments").

Nonetheless, I am granting the motion for reconsideration. Having again reviewed the relevant statute and the terms of plaintiff's agreements, I conclude that my application of section 2711(a)(3) to the Management Agreement and the other agreements in this case, whether collateral or not, was in error.

Section 2711(a)(3) states:

For purposes of this chapter, any reference to the management contract described in paragraph (1) shall be considered to include all collateral agreements to such contract that relate to the gaming activity.

25 U.S.C. § 2711(a)(3). The phrase "management contracts described in paragraph (1)" refers to section § 2711(a)(1), which applies only to management contracts for the operation and management of *Class II* gaming operations. As the Court now understands, the Management Agreement in this lawsuit was explicitly amended in 1999 to provide that plaintiff Mohawk Management would manage *only* Class III games in the casino.[5] The amended Management Agreement is explicit: Mohawk Management has no responsibility for Class II games.

Collateral agreements are considered management contracts in the IGRA only when they relate to Class II gaming. Therefore, sections 533.1 and 533.7 (the "voiding" regulations) do not apply to any of the agreements that I deem to be "collateral" to the Management Agreement. This includes the LPA.

The portion of the IGRA which applies the provisions of section 2711 to Class III management contracts does not change the above result. Section 2710(d)(9) states in relevant part that the "Chairman's review and approval of such [Class III] contract shall be governed by the provisions of subsections (b), (c), (d), (f), (g), and (h) of section 2711 of this title." 25 U.S.C. § 2710(d)(9). Thus, while most of the subsections of § 2711 apply to Class III contracts, § 2711(a)—including § 2711(a)(3)—does not.

■ Defendant argues that Congress could not have intended to restrict the application of section 533.7 to those agreements which are collateral to Class II contracts. I disagree. Congress provides for different treatment of Class II and Class III gaming in any number of places in the

---

**4.** In fact, defendant argues that the NIGC would have rejected the management agreement in light of the overall structure of the agreement between plaintiffs and the Tribe. Plaintiffs argue that they would have obtained NIGC approval relatively quickly in light of the extensive regulatory review conducted by the BIA—that in fact, this was the understanding. The Court will not speculate on any hypothetical progress or outcome of the NIGC "stage" of the approval process. However, I agree with defendant that the NIGC's

responsibilities under the IGRA (including, for example, a determination of whether the fees to be collected comply with statutory mandates) would warrant review of all the project documents in this instance.

**5.** Plaintiff states that purpose of this amendment was "to expedite the approval of the Management Agreement by the NIGC." (Mem. in Supp. of Mot. For Reconsid. at 9.)

IGRA.[6] In addition to subsection (a), subsections (e) and (i) of section 2711 do not apply to Class III management contracts. There is no basis from which I may imply, as defendant urges, that Congress "meant to" subject contracts collateral to both Class II and Class III management agreements to the "voiding" regulations of the statute. It is not inconsistent to require that an agreement with a Tribe be subject to NIGC review on the basis of its relationship to a Class III management contract, and at the same time to place that same agreement outside the province of a strict voiding provision.

■■ For the reasons discussed above, plaintiff's motion for reconsideration is granted, and upon reconsideration, I hold that the collateral agreements, including the LPA, are not subject to the voiding provisions of the IGRA. Accordingly, that portion of the opinion in which I held that the collateral agreements were void under 2711(a)(3) is vacated. This applies not only to the LPA, but the Development and Construction Agreement and the Shared Facilities Agreement. However, there were alternative grounds for voiding the other two agreements. The Shared Facilities Agreement was deemed void for lack of a condition precedent contained in the

**6.** Class III gaming is also regulated by tribal-state compacts, thus necessitating less of a "protective role" for the NIGC in evaluation of Class III management agreements. *See* 25 C.F.R. § 501.2(d) ("Nothing in the [IGRA] or this Chapter shall impair the right of an Indian tribe to regulate class III gaming on its Indian lands concurrently with a State, except to the extent that such regulation is inconsistent with, or less stringent than, the State laws and regulations made applicable by a Tribal–State compact that is entered into by an Indian tribe under the [IGRA] and that is in effect.")

**7.** That concession is no doubt why the proper plaintiff, Monticello, did not also move for reconsideration.

contract. *See Catskill*, 144 F.Supp.2d 215. *See also* n. 10 at *infra*, section 2. The Development and Construction Agreement was deemed void under 25 U.S.C. § 81. *See Catskill*, 144 F.Supp.2d 215. In a footnote, Catskill Development argues that this holding was in error, due to a 1999 Amendment to section 81. There is, however, no need for me to decide whether the original or the amended section 81 applies, because it is now clear that the Development and Construction Agreement is void under IGRA as a management contract: plaintiff now represents to the Court that it was the position of the NIGC, expressed by letter dated April 19, 2000, that *both* the Management Agreement *and* the Development and Construction Agreement constituted "management contracts" for the purposes of NIGC review.[7] (Pl. Mem. at 16.)

## 2. The LPA Is Not Invalid Absent Approval Of The Trust Transfer

■ Defendant originally argued in its motion to dismiss that the LPA was not valid because final BIA approval for the land-trust transfer, required under 25 U.S.C. § 2719, was a condition precedent to the validity of the contract.[8] Because I

**8.** Section 20 states that gaming shall not be conducted "on lánds acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988," unless certain limited conditions are met. 25 U.S.C.A. § 2719(a). Under the exceptions to § 2719(a), gaming on newly acquired trust lands may be conducted when:

> [t]he Secretary, after consultation with the Indian tribe and appropriate State, and local officials ... determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian Tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conduct-

found the LPA void as a collateral agreement to the Management Agreement, I did not address this argument. Defendant asks that I do so now.

■ A condition precedent is "an act or event, other than a lapse of time, which, unless the condition is excused, must occur before a duty to perform a promise in the agreement arises." *Oppenheimer & Co., Inc. v. Oppenheim, Appel, Dixon & Co.,* 86 N.Y.2d 685, 691, 636 N.Y.S.2d 734, 737, 660 N.E.2d 415 (1995) (citing Calamari & Perillo, *Contracts* § 11–2, at 438 [3d ed.] and *Restatement [Second] of Contracts* § 224). However, not every condition in a contract is precedent to the existence of a valid, enforceable contract. *See Matco Elec. Co., Inc. v. American District Telegraph Co., Inc.,* 156 A.D.2d 840, 841, 549 N.Y.S.2d 843, 844 (3d Dep't 1989). As the court in *Oppenheimer* opined:

> Most conditions precedent describe acts or events which must occur before a party is obligated to perform a promise made pursuant to an existing contract, a situation to be distinguished conceptually from a condition precedent to the formation or existence of the contract itself. In the latter situation, no contract arises 'unless and until the condition occurs.'

*Oppenheimer,* 86 N.Y.2d at 690, 636 N.Y.S.2d at 737, 660 N.E.2d 415 (citing Calamari & Perillo at § 11–5, at 440). *See also Matco Elec. Co. v. American Dist.*

*Tel. Co.,* 156 A.D.2d 840, 549 N.Y.S.2d 843 (3d Dept 1989)

■ The language of condition must be explicit. For example, the contract in *Oppenheimer,* a conditional letter agreement, contained more than one provision that explicitly declared that, in the absence of certain conditions, the agreement "shall be deemed null and void and of no further force and effect," and neither party was to have "any rights against nor obligations to the other." *Oppenheimer,* 86 N.Y.2d at 688, 636 N.Y.S.2d at 735–36, 660 N.E.2d 415. Another provision of the agreement stated that the parties "agree not to execute and exchange the Sublease unless and until ... the conditions set forth in paragraph (c) [requiring written consent] are timely satisfied." *Id.* The court held that the letter agreement contained a condition precedent, because it provided "in the clearest language that the parties did not intend to form a contract 'unless and until' defendant received written notice of the prime landlord's consent on or before February 25, 1987." *Id.* at 695, 636 N.Y.S.2d at 740, 660 N.E.2d 415.

The LPA contains no such language. While Catskill Development's obligation to "sell" the land and the Tribe's obligation to "purchase" the land was contingent upon the United States' decision to accept the land into trust, BIA approval was not a condition precedent to the validity of the entire LPA.[9] The Agreement was fully ex-

---

ed concurs in the Secretary's determination. . . .

25 U.S.C. § 2719(b)(1)(A) Unlike Section 2711, there is no regulation related to Section 2719 which explicitly states that contracts creating off-reservation gambling projects are void without the Secretary's approval. Indeed, defendant did not argue in its motion to dismiss that failure to obtain approval for the trust transfer operated to "void" the LPA.

9. This conclusion does not require any change in my previous holding that the

Shared Facilities Agreement, the language of which does create a condition precedent to the validity of the contract. Section 15.15 states that the Agreement "shall become effective, of full force and effect and the parties hereto shall be bound hereby, on the Effective Date (as defined in the Management Agreement)." (Carpinello Aff. at Ex. D at 25.) The Effective Date in the Management Agreement is "the date on which the Chairman of the NIGC grants written approval" of the Management Agreement. (Id. at Ex. C at 3.) Thus,

ecuted was binding on both parties. It contains provisions which obligate the Tribe to use its best efforts to help obtain approval for the trust-transfer. (See Carpinello Aff. at Ex. A at §§ 8.01, 8.02.) It is a clear example of a contract where the parties' *performance* is conditioned on the governmental approvals, rather than one where the agreement itself is so conditioned. *See Buffardi v. Parillo,* 168 A.D.2d 812, 813, 563 N.Y.S.2d 948, 950 (3d Dept 1990).

The cases cited by defendant do not require any other conclusion. The contract at issue in *Cauff, Lippman & Co. v. Apogee Finance Group, Inc.,* 807 F.Supp. 1007 (S.D.N.Y.1992), included a condition requiring KLM Supervisory Board approval for the transaction. *Id.* at 1017. The court nevertheless found, based on the language in the contract, that the parties intended to form a valid contract. The contract stated that it "constitute[s] a binding agreement between [Cauff, Lippmand] and [Apogee] with respect to this transaction." *Id.* at 1020. The Court held that "[s]uch language strongly suggests that the parties intended to form a binding contract obligating each party to negotiate in good faith to finalize all remaining terms in a manner consistent with the agreed upon terms. . . . The inclusion [of] the . . . . condition precedent . . . is not inconsistent with an intention to enter into a binding contract." *Id.*

In *Office of the Comptroller General of Republic of Bolivia on Behalf of Bolivian Air Force v. Int'l Promotions & Ventures, Ltd.,* 618 F.Supp. 202, 207 (S.D.N.Y.1985), the court held that failure to obtain a government license for the object of the contract rendered the contract void. Again, however, this conclusion was based on the language of the contract, which explicitly conditioned validity on procuring the license. It stated that "[t]he present contract will become effective once the following requirements ha[ve] been complied with," and listed as one of the requirements the following: "Four.-The transfer license of the goods, object of the present contract, ha[s] been [obtained] by 'THE SELLER' [defendant] in the United States of America, within the maximum deadline of thirty (30) days, computed from the time the present document was subscribed [i.e. September 30, 1981]." *Id.* at 204. Again, no such language in the LPA conditions the validity of effectiveness of the contract on BIA approval.

Thus, upon reconsideration, defendant's motion to dismiss plaintiff's claim for tortious interference with the LPA is denied.

3. Catskill Development's Request To Review The Dismissal Of The Claim For Tortious Interference With The Gaming Management Agreement Is Denied

■■■ In yet another footnote, Catskill Development also seeks to reargue the motion to dismiss the claim for tortious interference with the Management Agreement. Plaintiff Mohawk Management is the only plaintiff who was a party to the Management Agreement, and as such is the only party who could recover for tortious interference with this Agreement. Mohawk Management did not move for reconsideration of this holding. So I am constrained to ignore Catskill Development's suggestion that I reopen the matter.

Furthermore, even if the request for reconsideration were properly before the

at the time of Park Place's alleged interference, the Shared Facilities Agreement was not in force.

Court, I would not change my conclusion that the Management Agreement is void for lack of NIGC approval. Plaintiff argues that the provisions in IGRA which operate to void unapproved management contracts were intended for the protection of tribes, and as a matter of equity, should not be used to benefit a wrongdoer by shielding it from liability for its own fraud. In support, plaintiff cites *Tri–Millennium Corp. v. Jena Band of Choctaw Indians*, 725 So.2d 533 (La.App.1998). In that case, the court denied the Tribe's defense of no cause of action and enjoined the Tribe from negotiating a casino project with any other parties. *Id.* at 538. The court allowed plaintiffs' claims to proceed in spite of the fact that the contract between plaintiffs and the Tribe may have been void under section 81 or the IGRA. What Catskill Development fails to note, however, is that the court in *Tri–Millennium* found that plaintiffs had stated causes of action for conversion, unjust enrichment and fraud, and could therefore proceed with their request for injunctive relief *despite* the fact that they did not have a claim for breach of contract. *Id.* at 537–38. *Tri–Millennium* therefore has no applicability to this case.

## CONCLUSION

For the reasons discussed above, plaintiff's motion for reconsideration is granted, and defendant's motion to dismiss the claim for tortious interference with the Land Purchase Agreement is denied. Portions of the May 14 opinion are vacated as discussed above.