CATSKILL DEVELOPMENT, L.L.C., Mohawk Management, L.L.C., and Monticello Raceway Development Company, L.L.C., Plaintiffs,

v.

PARK PLACE ENTERTAINMENT CORP., Defendant.

No. 00 CIV. 8660 CM GAY.

United States District Court, S.D. New York.

May 14, 2001.

Herbert F. Kozlov, Parker, Duryee, Rosoff & Haft, Thomas P. Puccio, New York City, John P. Gallagher, Stites & Harbison, Atlanta, GA, William W. Hopson, J.D. Humphries, III, Stites & Harbison, PLLC, Atlanta, GA, for Plaintiffs.

David Boies, Boies, Schiller & Flexner, L.L.P., Armonk, NY, for Defendant.

## MEMORANDUM AND DECISION GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS

McMAHON, District Judge.

Plaintiffs Catskill Development, L.L.C. ("Catskill"), Mohawk Management, L.L.C. ("Mohawk") and Monticello Raceway Development Co., L.L.C. ("Monticello") (collectively, the "Catskill Group"), bring this action in diversity against Park Place Entertainment Corp. ("Park Place"), claiming tortious interference with contractual relations, interference with prospective business relationships, unfair competition, and violations of the Donnelly Act, N.Y. Gen. Bus. Law § 340. Plaintiffs allege that defendant, one of the world's largest casino companies, wrongfully induced officials of the St. Regis Mohawk Nation ("Mohawks") to terminate the Mohawks' contractual agreements and business relationships with plaintiffs relating to the development and management of a proposed $500 million Native American casino at the Monticello Raceway in Sullivan County, New York (the "Casino Project").

The case is before me on defendant's motion to dismiss. For the reasons below, I grant defendant's motion to dismiss plaintiffs' claims for tortious interference with contractual relations, for unfair competition, and for violations of the Donnelly Act. The motion to dismiss plaintiffs' claim for interference with prospective business relations is denied.

## I. BACKGROUND

The factual allegations below are taken from plaintiffs' complaint and documents relied on within or attached to the complaint.

### A. Tribal Gaming in New York

Casino gambling is illegal in New York State. However, a federal statute, the Indian Gaming Regulatory Act ("Gaming Act" or "IGRA"), 25 U.S.C. § 2701—2721 (1988), permits different types of gaming, including casino gambling, on Native American land under specified conditions.

The act classifies gaming activities into three different categories. Tribes have exclusive jurisdiction over Class I gaming, which includes social games and traditional forms of Indian gaming connected to tribal ceremonies. 25 U.S.C. §§ 2703(6), 2719(a)(1). Class II gaming, defined by the Gaming Act to include "the game of chance commonly known as bingo (whether or not electronic, computer or other technologic aids are used in connection therewith) ... including (if played in the same location) pull-tabs, lotto, punch boards, tip jars, instant bingo, and other games similar to bingo ...," are regulated by the National Indian Gaming Commission (NIGC).[1] All other gaming activity (including both electronic gaming devices and traditional casino games, such as card

---

1. Class I and II gaming activities are not at issue in the present case.

tables, craps, roulette, and slot machines) is Class III gaming.

The Gaming Act permits Native American tribes to petition the Governor of their host state for a so-called "compact" that would allow Class III gaming on reservation lands and/or on lands to be acquired and held in trust by the United States Government for the benefit of the tribe. 25 U.S.C. § 2710(d)(3). These compacts define which types of Class III gaming activities the Tribes can conduct, and usually provide that a portion of the gaming revenues will go to the State. (Compl. at 26–28.) Any compact between the state and the Tribe must be approved by the Secretary of the Interior. § 2710(d)(3)(B).

To date, only two tribes in New York have successfully petitioned the Governor for compacts: the Oneida Nation received its compact in 1992, and the St. Regis Mohawk Tribe in 1993. The Oneidas opened a casino in western New York, near Syracuse, and sometime after 1996, the Mohawks opened a small casino on their Akwesasne Reservation near the Canadian border. (Compl. at 26–30.) *See also* Hearing on Indian Gambling Before the Senate Comm. on Indian Affairs, 1994 WL 377835 (F.D.C.H. July 19, 1994) (statement of Ray Halbritter, Nation Representative, Oneida Indian Nation of New York); Robert D. McFadden, Cuomo Accepts Mohawk Plan for a Casino, N.Y. Times, Oct. 16, 1993, at 125; James Dao, Accord Signed for a Casino in New York State, N.Y. Times, Mar. 11, 1993, at B1.

In May 1999, the Mohawks' amended their compact with New York State to allow for the use of electronic gaming devices on the Akwesasne reservation casino. This authorization was set to expire on May 27, 2000. Defendant contends that the State and the Mohawks negotiated another electronic gaming amendment, which would be effective until May 27, 2005. (See Carpinello Decl. at Ex. 5.) They claim, however, that the amendment was twice rejected by the Secretary of the Interior, and is not currently in effect. (See Carpinello Decl. at Ex. G.) Plaintiffs do not dispute this. They argue, however, that while such an amendment "would have added electronic terminals," it would not have precluded approval of the [agreements made between Catskill and the Tribe] and Catskill's legal ability to open the [Monticello] facility. , The agreements . . . do not legally require electronic terminals. (Mem. in Opp. to Def.'s Mot. to Dismiss at 25.) As the parties have not provided a copy of the existing compact between the Mohawks and New York State, I can not determine whether the compact would have to be amended in order for the Mohawks to even build a new casino somewhere other than on the Akwesasne reservation. However, it is clear that without an amendment, no Mohawk casino, whether at Monticello or somewhere else, could run electronic games.

In a decision of some significance to this case, New York State Supreme Court Justice Joseph C. Teresi held, on April 20, 2001, that because the New York State Constitution does not grant residual powers to the executive to bind the State to an Indian Gaming Compact, the Governor of New York was not empowered to enter into these compacts without legislative concurrence.[2] *Saratoga County Chamber*

---

**2.** Justice Teresi concluded that neither the IGRA nor the level of permitted legal gambling activity in New York "has in any way amended New York Law." *Saratoga County Chamber of Commerce, Inc.,* at 8. This is consistent with other courts' analysis of the IGRA. *See Pueblo of Santa Ana v. Kelly,* 932 F.Supp. 1284, 1296 (D.N.M.1996) (finding evidence in legislative history that Congress did not intend that the Secretary's approval override deficiencies in the compact under State law), *aff'd* 104 F.3d 1546 (10th Cir.1997).

*of Commerce, Inc. v. Pataki,* Index No. 11971–99 (Sup.Ct. N.Y., April 10, 2001). Accordingly, Justice Teresi declared the 1993 Compact signed by the Governor and the Mohawks void and unenforceable. Moreover, Justice Teresi enjoined the Governor from entering into any future gaming compacts without prior legislative concurrence.

## B. The Catskill Deal

In 1995, leaders of the Mohawk tribe opened discussions with Sullivan County businessmen who were looking to develop a gambling facility, using the Monticello Raceway in Monticello, New York, as a cornerstone for the operation. In October 1995, these businessmen formed Catskill to pursue the Casino Project and seek federal approval for the plan. (Compl. at ¶ 33–37.) Catskill planned to donate 30 acres to the Tribe, which would transfer the land to the U.S. Government to hold in trust for the Mohawks. Catskill would help the Mohawks operate the casino, and in return take a share of the revenues.

Catskill acquired the Monticello Raceway for $10,000,000 on June 3, 1996. Of the real property purchased, 29.31 acres adjacent to the Raceway were set aside for the casino. Catskill created Mohawk Management, a subsidiary of Alpha Hospitality, Inc., to provide technical and financial expertise to assist the Mohawks in obtaining financing and to manage, operate, and maintain the casino. Catskill also created Monticello Raceway Development to develop the casino property, and to assist the Mohawks in obtaining a loan to finance the construction, equipping, and operation of the casino. As the coordinating entity, Catskill acted for all plaintiffs in seeking the necessary local, state and federal approvals needed to build and operate the casino. (Compl. at 38–42.)

On July 31, 1996, the Mohawks and plaintiffs allegedly entered into a number of agreements, which plaintiffs claim were re-executed and affirmed a number of times through the year 2000 (although they do not attach copies of those agreements to the complaint). The agreements are as follows:

(1) A Land Purchase Agreement between the Regis Mohawk Gaming Authority and Catskill Development contemplating the transfer of the Raceway property from Catskill to the United States government to be held in trust for the Mohawks, in exchange for which the Mohawks would pay Catskill $10 million, the purchase price of the property. (Carpinello Aff. at A.)

(2) A Mortgage Agreement which would, upon execution, provide for a mortgage on the Mohawks' leasehold of the subject property. Defendant provides in its papers an unsigned copy of this agreement, claiming that it was never executed because it was dependent on the consummation of the land transfer described in the Land Purchase Agreement. Plaintiffs do not dispute that this agreement was never executed. (Id. at B.)

(3) A Gaming Facility Management Agreement granting Mohawk Management LLC the exclusive right to manage the day-to-day operations of the contemplated casino. Under the agreement, the parties are to establish a Management Business Board, with two members from Mohawk Management and two from the Tribe, to oversee the operations. Any action by the Board requires three of the four members to agree. Under the agreement, Mohawk Management is to negotiate and to enter into contracts for operation of the casino on behalf of and in the name of the Tribe, although contracts over $25,000 must be approved by the Board. The Tribe agrees to pay Catskill 35% of Net Revenues. (Id. at C.)

(4) A Shared Facilities Agreement between the Tribe and Catskill Development, LLC, under which the Tribe agrees to develop and build the casino, and Catskill agrees to improve and operate the racetrack. The agreement establishes a Shared Facilities Business Board, with the same representation and voting rules as the Management Business Board described above. (Id. at D.)

(5) A Development and Construction Agreement between the Tribe and Gaming Authority on one side, and Monticello Raceway Development Company, LLC on the other, in which the Tribe grants the developer the right to plan and to build the casino, and the developer agrees to help the Tribe obtain financing for the construction. The agreement establishes a Development Business Board, consisting of the same members as the Management Business Board, to approve certain aspects of the project, such as the budget and the choice of architect. The agreement was signed by the Gaming Authority, the Tribe, and the Monticello Raceway Development Company. (Id. at E.)

## C. Federal and State Approval of Indian Gaming

The contemplated casino project between plaintiffs and the Mohawks was subject to regulatory approval by the Federal Government, and as discussed above, by New York State. Defendant argues that certain of the required approvals affect the validity of the agreements signed by plaintiffs and the Mohawks, in that the agreements could not become legally binding contracts without those approvals.

### 1. IGRA

The primary statute regulating Indian gaming is the IGRA. As explained above, the IGRA allows Indian tribes to conduct gaming operations on reservation lands and, under certain circumstances, on "off-reservation" lands. The Act established the National Indian Gaming Commission (NIGC) to regulate Indian gaming.

Under the Act, gaming management contracts[3] for Class III gaming must now be approved by the Commissioner of the NIGC. 25 U.S.C. §§ 2705(a), 2711(b). Regulations passed pursuant to the IGRA state that such contracts "shall become effective upon approval by the Chairman," 25 C.F.R. § 533.1, and that a gaming management contract not approved by the NIGC is void. 25 C.F.R. § 533.7. *See also International Gaming Network v. Casino Magic Corp.*, 120 F.3d 135 (8th Cir.1997) (noting that agreement to build and manage casino on tribal land was not binding on parties because it lacked NIGC approval); *Casino Resource Corp. v. Harrah's Entm't, Inc.*, 243 F.3d 435 (8th Cir.2001). In addition, collateral agreements[4] to the management contract that relate to Indian gaming must also be approved, and are thus void without approval. 25 U.S.C. § 2711(a)(3). *See also U.S. ex. rel. Mosay v. Buffalo Bros. Mgmt.*, 20 F.3d 739, 743

---

**3.** "Management contract" is defined as "any contract, subcontract, or collateral agreement between an Indian tribe and a contractor or between a contractor and a subcontractor is such contract or agreement provides for the management of all or part of a gaming operation." 25 C.F.R. § 502.15.

**4.** Collateral agreements are defined as "any contract, whether or not in writing, that are

related, either directly or indirectly, to a management contract, or to any rights, duties or obligations created between a tribe (or any of its members, entities, or organizations) and a management contractor or subcontractor (or any person or entity related to a management contractor or subcontractor)." 25 C.F.R. § 502.15.

(7th Cir.1994) (explaining effect of IGRA on contracts with Indian tribes).

A separate section of the IGRA describes the approval process for planned "off-reservation" gambling projects on lands to be transferred and held in trust by the U.S. for the benefit of a tribe. Such a project must be expressly authorized by the Secretary of the Interior. IGRA § 20, 25 U.S.C. § 2719(b)(1)(a). *See also Keweenaw Bay Indian Cmty. v. United States,* 136 F.3d 469, 474 (6th Cir.1998). The Section states that gaming shall not be conducted "on lands acquired by the Secretary in trust for the benefit of an Indian tribe after October 17, 1988," unless certain limited conditions are met. 25 U.S.C.A. § 2719(a). Under the exceptions to § 2719(a), gaming on newly acquired trust lands may be conducted when:

> [t]he Secretary, after consultation with the Indian tribe and appropriate State, and local officials ... determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian Tribe and its members, and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination....

25 U.S.C. § 2719(b)(1)(A) Unlike Section 2711, there is no regulation related to Section 2719 which explicitly states that contracts creating off-reservation gambling projects are void without the Secretary's approval.

### 2. *Section 81*

Defendant argues that the agreements at issue in the present case also implicate an earlier statute relating to contracts with Indian parties, 25 U.S.C. § 81. Under Section 81, non-Indian parties contracting with Indian tribes must submit certain contracts to the Secretary of the Department of the Interior (through the Bureau of Indian Affairs) for approval. Contracts requiring approval under Section 81 and not approved by the BIA are invalid. *See Green v. Menominee Tribe of Indians in Wisconsin,* 47 Ct.Cl. 281, aff'd. 233 U.S. 558, 34 S.Ct. 706, 58 L.Ed. 1093 (1914).

At the time plaintiffs made their agreements, and until March 14, 2000, when Section 81 was amended, the statute read:

> No agreement shall be made by any person with any tribe of Indians, or individual Indians not citizens of the United States, *for the payment or delivery of any money or other thing of value,* in present or in prospective, *or for the granting or procuring any privilege* to him, or any other person *in consideration of services for said Indians relative to their lands,* or to any claims growing out of, or in reference to, annuities, installments, or other moneys, claims, demands, or thing, under laws or treaties with the United States, or official acts of any officers thereof, or in any way connected with or due from the United States, unless such contract or agreement be executed,and approved as follows:
>
> . . . . .
>
> Second. It shall bear the approval of the Secretary of the Interior and the Commissioner of Indian Affairs indorsed upon it.
>
> .... All contracts or agreements made in violation of this section shall be null and void.

25 U.S.C. § 81 (1958) (emphasis added), *amended by* 25 U.S.C. § 81(a)-(e) (2000).

Prior to amendment, there was significant litigation on the question of which contracts were for "services relative to Indian lands" falling within the purview of Section 81. Some courts, analyzing whether a management contract between a tribe

and an outside party was sufficiently related to Indian lands, applied the fact-specific inquiry used in *Altheimer & Gray v. Sioux Mfg. Corp.*, 983 F.2d 803, 812 (7th Cir. 1993)[5]; *Penobscot Indian Nation v. Key Bank of Maine*, 112 F.3d 538, 552 (1st Cir.1997); *U.S. ex rel. Mosay v. Buffalo Bros. Mgmt., Inc.*, 20 F.3d 739 (7th Cir. 1994); *See also In re U.S. ex rel. Hall*, 825 F.Supp. 1422, 1433 (D.Minn.1993) (applying *Altheimer* to non-management contracts), aff'd. 27 F.3d 572, *cert. denied* 513 U.S. 1155, 115 S.Ct. 1112, 130 L.Ed.2d 1076. *But see U.S. v. Hattum Family Farms*, 102 F.Supp.2d 1154, 1161 (D.S.D. 2000) (declining to apply *Altheimer*).

Many parties contracting with an Indian tribe could not be certain approval was required unless and until the question was fully litigated. Thus, because of the harshness of the penalty (invalidation), most contracts, regardless of whether they fell within Section 81, were submitted to the BIA for Section 81 approval. *See* S.Rep. No. 106–150, Encouraging Indian Economic Development, To Provide for the Disclosure of Indian Tribal Sovereign Immunity in Contracts Involving Indian Tribes, and for Other Purposes, Sept. 8, 1999, at 5–7 (hereinafter "Senate Report").

The statute was amended in part to address this problem and to provide more guidance on the types of contracts that must be approved in order to be valid. *See id.* It now reads:

No agreement or contract with an Indian tribe that *encumbers Indian lands for a period of 7 or more years* shall be valid unless that agreement or contract, bears the approval of the Secretary of the Interior or a designee of the Secretary.

25. U.S.C. § 81(b) (2000). The Senate Report on the bill discussed the types of contracts that should not come within Section 81. By replacing the phrase "relative to Indian lands" with "encumbering Indian lands," it explained that the bill will:

no longer apply to a broad range of commercial transactions. Instead, it will only apply to those transactions where the contract between the tribe and a third party could allow that party to exercise exclusive or nearly exclusive proprietary control over the Indian lands.

Senate Report at 9. The statute requires the Secretary to develop regulations specifying the types of contracts that fall within Section 81. As of the date of this opinion, no such regulations exist.

3. *Relationship between the IGRA and Section 81*

Indian gaming has been subject to regulation under both Section 81 and the IGRA.

Prior to passage of the IGRA, certain management contracts for Indian gaming establishments were held to be subject to Section 81's invalidation provision. *See*

**5.** The factors used in *Altheimer* to determine whether a particular contract is relative to Indian land are: (1) whether the contract relates to the management of a facility located on Indian lands; (2) whether the contract grants non-Indians the exclusive right to operate the facility. (3) whether the contract forbids the tribe from encumbering the property; and (4) whether the validity of the depends upon the legal status of tribes as a separate sovereign. *Altheimer*, 983 F.2d at 807. No one factor is a *sina qua non* of

finding that Section 81 applies. *Id.* at 811, (*quoting Barona Group of Capitan Grande Band of Mission Indians v. American Management & Amusement, Inc.*, 840 F.2d 1394 (9th Cir.1987), cert. dismissed, 487 U.S. 1247, 109 S.Ct. 7, 101 L.Ed.2d 958 (1988)). Since most management contracts contain all of these elements in varying degree, Section 81 required Secretarial approval for the majority of these agreements. *See* 25 U.S.C. § 81; *Shakopee*, 616 F.Supp. at 1209.

*generally Barona Group of Capitan Grande Band of Mission Indians v. American Mgmt. & Amusement, Inc.,* 840 F.2d 1394 (9th Cir.1987); *A.K. Mgmt. Co. v. San Manuel Band of Mission Indians,* 789 F.2d 785 (9th Cir.1986); *Pueblo of Santa Ana v. Hodel,* 663 F.Supp. 1300 (D.D.C.1987); *Shakopee Mdewakanton Sioux Cmty. v. Pan American Mgmt. Co.,* 616 F.Supp. 1200 (D.Minn.1985), *dismissed on other grounds,* 789 F.2d 632; *Wisconsin Winnebago Bus. Comm. v. Koberstein & Ho–Chunk Mgmt.,* 762 F.2d 613 (7th Cir.1985). *See also Citizen Band Potawatomi Indian Tribe of Oklahoma v. Enter. Mgmt. Consultants, Inc.,* 734 F.Supp. 455 (W.D.Okla.1990) (IGRA held not to apply) Although these holdings were very fact specific, the inquiry usually centered on the level of control the tribe retained over the operations.

At least in part, the IGRA was passed in response to the uncertainty over these holdings. Congress noted in the text of the statute that "[f]ederal courts have held that [Section 81] requires Secretarial review of management contracts dealing with Indian gaming, but does not provide standards for approval of such contracts." P.L. 100–497 (1988). *See also* Senate Report at 5–7. Thus, as one court has explained:

> When section 81 is read in conjunction with the [IGRA], two distinct, successive regulatory regimes can be seen. One is administered by the [BIA] under section 81, the other by the [NIGC] under the [IGRA]. In the first regime, contracts relating to Indian lands, including casino management contracts, must be submitted to the Bureau for approval under criteria undefined by statute or regulation; failure to submit exposes the contractor to the fell sanction of a *qui tam* suit. In the second regime, a class of contracts—casino management contracts—are carved out of section 81 and

subjected to the exclusive regulatory authority of the new Commission administering the new Act, along with certain contracts—contracts collateral to casino management contracts—that never were subject to section 81. 25 U.S.C. § 2711(a)(3); 25 C.F.R. § 502.5.

*U.S. ex rel. Mosay v. Buffalo Bros. Mgmt., Inc.,* 20 F.3d 739, 743 (7th Cir.1994). Congress expressly reaffirmed the NIGC's obligation to approve gaming management contracts when it amended Section 81. 25 U.S.C. § 81(f)(2) (Supp. June 2000) (stating that nothing in Section 81 "shall be construed to amend or repeal the authority of the [NIGC] under the [IGRA]")

The court in *Mosay* questioned the continuing applicability of Section 81 to Indian gaming management contracts, and to other agreements that fall within the IGRA:

> We doubt that the *qui tam* provision of section 81 remains applicable to contracts now governed by the Indian Gaming Regulatory Act. Contractors would be subject to enormous legal risk that one of their contracts with an Indian tribe might be held to be a collateral agreement that they should have but failed to file, in which event they would have to repay everything they had received under the contract. Qui tam liability would expand indefinitely at the very moment that Congress had created a new administrative remedy and vested its enforcement in a new, specialized agency with its own detailed, measured, modern set of remedies.

*Mosay* at 743; *see also Wisconsin Winnebago,* 762 F.2d at 619 (holding that "section 81 governs transaction relative to Indian land for which Congress has not passed a specific statute.").

## D. Efforts to Obtain Approval Of The Monticello Casino Project

In 1996, Catskill and the Tribe sought BIA approval of the application to place the Monticello Raceway property into

trust for the benefit of the Tribe (the "land-into-trust" transfer). The Acting Area Director of the Eastern Area Office of the BIA ("EAO") approved Catskill's application in December 1998. The Director transmitted his findings and conclusions to the Indian Gaming Management Staff ("IGMS"), a department of the BIA. In February 1999, the Deputy Commissioner of Indian Affairs advised the EAO that she disagreed with the Regional Director's recommendation. Catskill and Mohawk representatives worked with federal officials to address BIA's concerns, and on October 29, 1999, the Mohawks requested that BIA again review its application. On December 14, 1999, they submitted revised agreements related to the Casino Project. Plaintiffs and the Mohawks continued to push for approval, and made changes to the proposal as requested by BIA.

On April 6, 2000, the Assistant Secretary for Indian Affairs wrote to Governor Pataki:

> The Department has completed its review of the Tribe's application. Based on the application and its supporting documentation, including the comments received from State and local government officials, and officials of nearby tribes, the Department has made findings of fact supporting the two-part determination required under Section 20(b)(1)(A) of IGRA. Based on these findings, I have determined that a gaming establishment on the 29.31 acre-parcel of land located in Monticello, New York, would be in the best interest of the Tribe and its members, and would not be detrimental to the surrounding community.... Pursuant to Section 20 of IGRA, I seek your concurrence in this determination.

(Compl. at Ex. H.)

According to Plaintiffs, the Mohawks had every reason to believe the Governor's concurrence would be readily procured. In support of this assertion, they point to two documents. The first is a March 14, 2000 letter from John F. O'Mara, the Governor's advisor on Indian casino issues and Indian land claims, to Robert A. Berman of Catskill. After taking "strenuous exception" to unidentified comments from plaintiff in an earlier letter, O'Mara continues:

> Let me assure you that any decisions which Governor Pataki makes with respect to the issue of casino gambling in New York will be made only in the best interests of the citizens of New York State. The Governor has expressed his strong support for a casino in the Catskills and I am confident that when the St. Regis Mohawks have obtained federal permission the Governor will respond expeditiously.

(Compl. at Ex. E.) Plaintiffs also point to a June 15, 1999 letter, purportedly signed by Governor Pataki and written to the Supervisor of the Town of Thompson in Monticello, which stated in part:

> Naturally, it has always been my goal to encourage all economic development strategies that will help ensure that Sullivan County and the City of Monticello enjoy the same economic resurgence that is taking place elsewhere throughout the State. Certainly, one project that shows tremendous potential is the St. Regis Mohawk Tribe's proposal to establish an off-reservation casino at the Monticello Raceway.

(Compl. at Ex. F.) Referring to a recent agreement between the State and the Tribe to allow video lottery games at the Akwesasne casino, the Governor said:

> I believe this historic agreement marks the beginning of a new partnership, forged in the spirit of cooperation, which

will smooth the path for other mutually beneficial agreements between our governments in the future.

(Id.). Pataki then confirmed the Town Supervisor's understanding that the Tribe's application for federal approval was still pending, and added:

It is also my understanding that the Mohawk Tribe and the management company, Catskill Development, have now provided the additional information that was requested by BIA. *Assuming the BIA's final determination is favorable, I am prepared to attempt to negotiate in good faith an amendment to the St. Regis Mohawk Tribe's gaming compact for an off-reservation casino at the Monticello Raceway in Sullivan County.*

(Id.)(emphasis added)

As noted above, the gaming compact had to be amended. At the very least, the amendment would have to allow for electronic gaming at the Raceway site, although it may have to be amended to allow Class III gaming of any kind at the Raceway—again, without a copy of the original compact, I cannot be sure. However, nothing in the text of Section 2719, under which the BIA approved the land-into-trust application, requires that an amended compact be in place in order for the Governor to provide his concurrence. Nevertheless, it appears from the letter cited above that Pataki intended to link renegotiation of the compact to his concurrence with the BIA. Regardless of what remained to be negotiated between the Tribe and the Governor, it is undisputed that Pataki did not, and at the time of this opinion still has not, made any such response to the BIA's recommendation that the land-into-trust application be approved.

Neither party has provided the Court with any information on whether the Tribe and Catskill had begun the process of seeking approval for the management contract, which had to be approved by the NIGC under 25 U.S.C. § 2711. However, it is undisputed that no such approval was given.

### E. Park Place's Alleged Involvement

Plaintiffs claim that the reason the project was never approved is because they were sabotaged by defendant's efforts to scuttle the Monticello Raceway casino project. By mid–1999, when according to plaintiffs it "became clear" that both the Federal Government and the Governor favored the casino project, Park Place principals allegedly sought an introduction to the Mohawks through former Senator Alfonse D'Amato, who was "acting as a consultant to Park Place." D'Amato introduced Park Place executives Goldberg and Cummis to Ivan Kaufman, CEO of Presidents Resorts Casino, Inc., ("Presidents"), the company that managed the Mohawk's small Akwesasne casino. The Mohawks owed the State of New York millions of dollars from the operation of the casino, which was losing money every month. Park Place allegedly feigned an interest in that casino in order to become involved with the Mohawks, and that it deliberately held out a false promise of financing to Presidents in exchange for an introduction to the Tribe. Later, after gaining the confidence of the Mohawk chiefs, Goldberg and Cummis "began to link Park Place's financial commitments to the Akwesasne casino to participation by Park Place in the Casino Project itself." As part of their efforts, plaintiffs complain that Goldberg and Cummis intentionally maligned Presidents and plaintiffs and to "actively advise the Mohawks to break their contract with Plaintiffs." (Compl. at 84—90.)

On April 11, 2000, Cummis wrote to Kaufman, forswearing any commitment to the Akwesasne casino:

Since I talked to you last, our financial due diligence has been on-going and is now complete. As a result of our financial due diligence, it would appear that the actual debt of the Tribe arising from the casino operation is substantially in excess of what we thought it was and we learned for the first time that there is more than $3 million owing to the State of New York. Our financial people have indicated that they do not think our investment in this facility makes any sense whatsoever. They estimated potential losses over the term of the contract to be as high as $40 million.

As you know, the only reason that we were interested in discussing with you any investment in the Akwesasne Casino is for the potential of an investment in a Class III Casino in the Sullivan County region.

While we remain interested in the possibility of a Sullivan County Class III casino with the Mohawks, we have also determined that they have a written agreement with the group from the Monticello racetrack. We strongly believe that the written agreement is not enforceable and we are reviewing the issues now.

(Compl. at J.)

Plaintiffs allege that, in spite of the letter, Cummis met the very next day with the Governor's counsel, Patrick Kehoe, ostensibly to discuss Park Place's potential management of the Akwesasne casino. (Compl. at Ex. K.) At this meeting, Cummis allegedly learned from Kehoe that the Governor was preparing to concur with the BIA regarding the Monticello casino project.

When the Mohawks' Tribal Administrator asked Catskill about potential involvement of Park Place in the project, Catskill allegedly informed the Tribe that it was not interested in any "partners" whose motives it could not determine and who might actually be adverse to the project. Plaintiffs allege that on April 13, 2000, the Tribal Administrator told a Catskill representative that the Mohawks had been advised by Cummis that he had met with the State, and that the Governor would not approve the Casino Project without Park Place's involvement.

Plaintiffs assert that Cummis and Goldberg flew to the Mohawk reservation on April 14, 2000, with the intent to "steal the Mohawks from plaintiffs and destroy the Casino Project before the release of the Governor's concurrence letter." Defendant allegedly told the Tribal Council that Pataki would not approve the Casino Project without Park Place's involvement and falsely represented that the State was about to shut down the Akwesasne casino for unpaid revenue sharing fees. Plaintiffs also allege that defendant intentionally misrepresented to the Mohawks that the federal approval granted to Catskill was "portable"; that a casino project on another site would actually be approved within four months, rather than three to four years; that Catskill and its principals were "unsuitable"; that the Mohawks' agreements with plaintiffs were not validly authorized or properly executed by the Mohawks; and that plaintiffs could not get NIGC approval. (Compl. at 101—106.)

On April 14, 2000, the Tribe entered into a written agreement with Park Place, which set forth "certain understandings" reached between the parties, namely, that (1) Park Place will be the exclusive developer and manager of any Mohawk casinos in New York State; (2) the Mohawks will receive 70% of profits after paying back Park Place for "advances" for the cost of development and construction; (3) Park Place will begin construction within 36 months of the agreement unless otherwise agreed by the parties; and (4) Park Place will pay the Mohawk's $3 million and in-

demnify the Tribe from litigation losses resulting from the Tribe's termination of its agreements with plaintiffs.[6] This document was signed by the "Three Chiefs" of the Tribe (Smoke, Ransom, and Thompson), three sub-chiefs, and Park Place President and CEO Arthur Goldberg. (Compl. at Ex. M.)

6. Pertinent parts of the text of this unusual agreement are set out below:

> [Park Place] will be the exclusive developer of any such Class II and/or Class III casino for the State of New York (excluding [the Akwesasne and one other potential project]) under a development agreement to be entered into hereafter in good faith by the parties;
>
> [Park Place] will also be the Manager of any such ... casino ... along terms substantially similar to those set forth in the purported Gaming Facility management Agreement between the Tribe and Mohawk Management, LLC, ... except that as an essential term of such any [sic] agreement [Park Place] will have an initial term of seven (7) years. [Park Place] and the Tribe will have a profit distribution of 70% to the Tribe and 30% to [Park Place].
>
> All of the foregoing is subject to the approval of NICG.
>
> [Park Place] will provide the financing necessary to construct such casino facilities. [Park Place] agrees that construction of a gaming facility will commence within thirty-six (36) months of this agreement unless otherwise extended by written consent of the Tribe. The Tribe's portion of the casino profits shall be utilized to pay back [Park Place's] advances. Such payback shall be completed within the seven (7) year term or less without penalty or any agreed upon extension of such term.

> . . . . .

> In consideration of the foregoing, [Park Place] will pay to the Tribe the sum of $3 million for use by the Tribe in it's discretion. Such payment will be made as soon as reasonably possible after full execution of this agreement and shall be paid back to [Park Place] only in the event that the Tribe does not or is unable to enter in the development, management and licensing agreements set forth above; and

After the agreement with Park Place was signed, plaintiffs also describe numerous alleged actions by Park Place and the Mohawks to interfere with or to prevent plaintiffs from striking a new deal with another tribe to use the property at the Monticello Raceway.[7] (Compl. at 118—131.)

> Both parties understand that there exists between the Tribe and Mohawk Management, LLC a purported Gaming Facility Management Agreement signed on July 31, 1996. Both the Tribe and [Park Place] believe such agreement is unenforceable and of no force and effect for, among other reasons, (1) it is subject to the approval of the NIGC, which approval has not been granted; and (2) there are serious questions as to whether the signatories on behalf of the Tribe to the agreement had the legal right and/or capacity to enter into such agreement and bind the Tribe. [Park Place] also understands the Tribe's legal position with respect to the unenforceable agreement and agrees that it will indemnify the Tribe against any litigation resulting from the Tribe entering into this Agreement with [Park Place] in substitution with the Tribe's prior understanding with the developers of a proposed casino at the Monticello Race Track.

7. Plaintiffs also allege that Park Place, "for a brief period of time," collaborated with Donald Trump and his organization to defeat the casino project. They also allege that Park Place principals Arthur Goldberg and Clive Cummis, along with Trump, sought the assistance of New Jersey Senator Robert Torricelli in this endeavor. They also refer to a "legal challenge" to the Governor's authority to amend the compact with the Mohawks that Plaintiffs' claim was "secretly orchestrated" by Trump and two "disinterested" New York legislators, and to "smear campaigns" instituted against the Governor, Catskill's principals, and the Mohawks by a nonprofit group called the "New York Institute for Law & Society."

## F. Tribal Divisions And The Tribal Court Suit Against Park Place

At the time of these machinations, the tribal chiefs were involved in a political struggle for control of the Tribe, which historically had been governed by a "Three Chiefs" system. *See Park Place Entm't v. Arquette,* 113 F.Supp.2d 322 (N.D.N.Y. 2000) (providing background on the current divisions within the St. Regis Tribe as they relate to a tribal court suit brought by former chiefs and other tribal members against the Three Chiefs and Park Place, and finding that the federal district court lacked subject matter jurisdiction to enjoin the tribal court proceeding). In 1995, the Tribe held a referendum on whether to abandon the Three Chiefs system and to adopt a new Tribal Constitution, which would create three branches of tribal government, including a Tribal Court. The Constitution provided for its own adoption with 51% of the voting tribal members. *Id.* The Tribal Clerk allegedly certified that 50.935093% of those voting were in favor of adopting the Constitution, yet certified that the Constitution was adopted by the requisite vote. *Id.* at 322–23. In June 1996 the Tribal Council rescinded the certification of the Constitution following a second referendum. At the end of June, in a third referendum, the Tribe allegedly voted to elect Ransom, Smoke and Thompson in a "clean slate" of Chiefs, rather than retain the current Tribal Council officials. However, not all of the Tribe accepted the results of this referendum.

On April 26, 2000, independent representatives of the Mohawk Tribe (including prior chiefs), filed a class action complaint in the St. Regis Mohawk Tribal Court against Park Place, Goldberg and Cummis, and the Three Chiefs who signed the agreement, asking the Court to nullify the agreement and seeking billions of dollars in damages. Soon after the complaint was filed, the Three Chiefs declared the Tribal Court invalid, raided the Court facilities, and removed the Court's computers and files. (Compl. at 116.) On June 2, 2000, Park Place brought suit in the Northern District of New York seeking: (1) an injunction against the Tribal Court proceeding and (2) a declaration that the Tribal Court was invalid and without authority to adjudicate the claims asserted. On September 18, 2000, Judge McAvoy dismissed Park Place's action for lack of subject matter jurisdiction. *Park Place Entm't Corp.,* 113 F.Supp.2d at 323 (noting that "significantly, the dispute does not involve a question of the limits of the Tribal Court's jurisdiction, but rather a question of whether the Tribal Court is a valid Tribal authority.") As of the date of this opinion, Park Place had appealed the district court's dismissal to the Second Circuit.

On March 20, 2001, the Mohawk Tribal Court entered a default judgment against Park Place and the other defendants in that case, and awarded $1.782 billion in actual damages and $5 million in punitive damages to plaintiffs. The Court sets forth findings of fact and conclusions of law regarding the validity of the contracts and the actions of Park Place and Catskill. *See Arquette v. Park Place Entm't Corp.,* Case No. 00C10133GN, Mar. 20, 2001 (St. Regis Mohawk Tribal Court, Hogansberg, NY). Park Place has advised the Court that it views this judgment as a nullity—a position it hopes will be sustained by the Second Circuit.

## II. CONCLUSIONS OF LAW

### A. Jurisdiction

The parties to this case have established diversity jurisdiction. However, in light of the St. Regis Mohawk Tribal Court's ruling, I will briefly address whether this Court can or should retain jurisdiction over this case, or whether the parties are

precluded from litigating any issues decided in the Tribal Court matter.[8]

1. *Comity Does Not Require A Stay of Proceedings Pending Final Appeal Of The Tribal Court Action*

 If personal and subject matter jurisdiction exists, a federal court may stay proceedings, or dismiss the case pending exhaustion of tribal remedies, as a matter of comity. If there is a tribal court that has, or may have, jurisdiction, the federal policy supporting tribal self-government supports deferring to the tribal court, particularly on issues of tribal court jurisdiction. *See Bank of Okla. v. Muscogee (Creek) Nation,* 972 F.2d 1166, 1170 (10th Cir.1992) (applying deferral rule when allegations were that the tribal court has no jurisdiction because the relevant activities took place outside the reservation); *Iowa Mutual Ins. Co. v. LaPlante,* 480 U.S. 9, 107 S.Ct. 971, 94 L.Ed.2d 10 (1987) (applying comity rule to diversity cases). The same comity principles require deferral to a tribal court's determination of the meaning of its own jurisdictional statutes. *See Twin City Const. Co. v. Turtle Mountain Band,* 911 F.2d 137 (8th Cir.1990). If the tribal court decides it has jurisdiction, the same deference policy precludes relitigation of issues resolved in tribal courts. *Iowa Mutual,* 480 U.S. at 19, 107 S.Ct. 971. However, the deferral rule is not mandatory, particularly if there is no pending tribal court action *and/or federal or state law controls resolution of the is-*

*sues in the case.* See, *e.g., Altheimer & Gray v. Sioux Mfg. Corp.,* 780 F.Supp. 504, 1991 WL 261332 at *4 (N.D.Ill.1991), rev'd on other grounds, 983 F.2d 803 (7th Cir. 1993) (contract stipulated that disputes would be resolved under Illinois law in Illinois state and federal courts), *cert. denied,* 510 U.S. 1019, 114 S.Ct. 621, 126 L.Ed.2d 585 (1993).

 Plaintiffs' claims for inducing breach of contract and interference are governed by New York's common law, and their other claims arise under New York statutes. The issue of the validity of the contracts requires application of Federal law, as does Defendant's *Noerr–Pennington* defense. The case involves no questions of tribal law, and no parties to the case are members of the Tribe. Moreover, only defendant Park Place is before both the Tribal Court and this Court. Plaintiffs in the Tribal Court action were not parties to the contracts—they are tribal members who disagree with the Tribal Council's decision to sever the Tribe's ties with Catskill. Comity does not compel me to abstain from deciding this case.

2. *The Tribal Court Ruling Does Not Bar Resolution Of Plaintiffs' Claims*

The parties do not contend that the Tribal Court's judgment is *res judicata* as to any of plaintiffs' claims. Plaintiffs do argue, however, that collateral estoppel, or issue preclusion, bars litigation of issues

---

**8.** The Court learned of the Tribal Court ruling after all briefing on defendant's motion was complete. By letter dated March 23, 2001, the Court invited the parties to submit comments on what effect, if any, the Tribal Court action has on this lawsuit. Both sides responded on March 28 by letter brief. Plaintiffs argued that collateral estoppel bars relitigation of whether enforceable contracts existed between the Tribe and plaintiffs, and whether Park Place interfered with the con-

tracts and the project. Defendant argued that the Tribal Court decision had no effect because (1) the Tribal Court is not a recognized, legitimate governmental entity of the Tribe, (2) the decision was a default judgment and is thus not entitled to collateral estoppel effect, and (3) the Tribal Court decision purports to decide issues based upon Mohawk tribal law and does not purport to decide any of the legal issues raised in the motion to dismiss.

also raised in the Tribal Court action, namely: whether the contracts between Catskill and the Tribe are void, and whether Park Place is liable for inducing breach of contract or interference. Plaintiffs are incorrect.

■ A party is collaterally estopped from raising an issue in a proceeding if: (1) the identical issue was raised in a previous proceeding; (2) the issue was "actually litigated and decided" in the previous proceeding; (3) the party had a "full and fair opportunity" to litigate the issue; and (4) the resolution of the issue was necessary to support a valid judgment on the merits. *Interoceanica Corp. v. Sound Pilots, Inc.*, 107 F.3d 86, 91 (2d Cir.1997).

■ The Tribal Court decision was a default judgment. While the Tribal Court made findings of fact, these were not necessary to entry of the default judgment. Furthermore, because the decision was a default judgment, these findings were not "actually litigated." According to the Restatement of the Law of Judgments, "In the case of a judgment entered by confession, consent or default, none of the issues is actually litigated. Therefore, the rule of this Section does not apply with respect to any issue in a subsequent action." Restatement of the Law of Judgments (2d) § 27 & comment e (1982). *See also Kelleran v. Andrijevic*, 825 F.2d 692, 700 (2d Cir.1987); *Abrams v. Interco Inc.*, 719 F.2d 23, 33 n. 9 (2d Cir.1983) (citing Restatement). Thus, collateral estoppel does not bar resolution of plaintiffs' claims.

I turn now to the merits of defendant's motion.

## B. Standard for Motion to Dismiss

Rule 12(b)(6) of the Federal Rules of Civil Procedure provides for dismissal of a complaint that fails to state a claim upon which relief can be granted. The standard of review on a motion to dismiss is heavily weighted in favor of the plaintiff. The Court is required to read a complaint generously, drawing all reasonable inferences from the complaint's allegations. *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 515, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972). "In ruling on a motion to dismiss for failure to state a claim upon which relief may be granted, the court is required to accept the material facts alleged in the complaint as true." *Frasier v. General Electric Co.*, 930 F.2d 1004, 1007 (2d Cir.1991). The Court must deny the motion "unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Stewart v. Jackson & Nash*, 976 F.2d 86, 87 (2d Cir.1992) (quoting *Conley v. Gibson*, 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

Defendant moves to dismiss Count 1, intentional tortious interference with contractual relations, on the ground that there was no enforceable contract in place at the time defendant is alleged to have induced the Mohawks' breach. Defendant also moves to dismiss Count 2, interference with prospective business relationship, on the grounds that plaintiffs have failed to allege (1) "wrongful conduct," and (2) that but for Park Place's conduct, plaintiffs would have succeeded in building their casino. Park Place moves to dismiss Count 3 for unfair competition on the same grounds as Count 1, and also on the grounds that plaintiffs have failed to allege any misappropriation of property. Defendant argues for dismissal of Count 4 on the grounds that plaintiffs have not alleged any of the elements of a Donnelly Act claim. Finally, defendant argues that the entire complaint should be dismissed because Park Place's alleged actions in lobbying the Mohawks are fully protected by the *Noerr–Pennington* doctrine and there-

fore cannot form the basis for either a tort or antitrust claim.

## C. Plaintiffs Fail To State A Claim For Tortious Interference Of Contract

■ The elements of tortious interference with contract are well-settled under New York law. The elements include: the existence of a valid contract between the plaintiff and some third party; knowledge of that contract by the defendant; defendant's intentional inducement of a breach by the third party to the contract; and damages to the plaintiff as a result of the third party's breach. *See Int'l Minerals and Resources, SA v. Pappas*, 96 F.3d 586, 595 (2d Cir.1996) (citing *Kronos, Inc. v. AVX Corp.*, 81 N.Y.2d 90, 94, 595 N.Y.S.2d 931, 612 N.E.2d 289 (1993)). The third's party's breach must have been caused by the defendant, and the plaintiff must prove that the third party would not have breached except for the wrongful activities of the defendant. *See Sharma v. Skaarup Ship Mgmt. Corp.*, 916 F.2d 820, 828 (2d Cir.1990).

That plaintiffs and the Mohawks had entered into agreements is beyond dispute. So is defendant's knowledge of the agreements. See supra, section I.E. Plaintiffs' allegations of interference are more than sufficient. And the existence of an indemnity agreement in favor of the Mohawks by Park Place supports a finding of knowing and wrongful interference. *See, e.g., Texaco v. Pennzoil*, 729 S.W.2d 768, 802–

03 (Tex.App.1987), *cert. dismissed* 485 U.S. 994, 108 S.Ct. 1305, 99 L.Ed.2d 686 (1988).

■ However, the New York Court of Appeals has made clear than an essential element of a claim for tortious interference of contract is the existence of an *enforceable* contract, as well as its breach as a result of the defendant's tortious conduct. *NBT Bancorp Inc. v. Fleet/Norstar Financial Group, Inc.*, 87 N.Y.2d 614, 621–22, 641 N.Y.S.2d 581, 584–86, 664 N.E.2d 492 (1996). Defendant claims that the agreements between Catskill and the Tribe are not enforceable contracts because they had not been approved as required under the IGRA or Section 81.[9] Defendant is correct.

1. *The gaming management agreement is void under 25 U.S.C. 2711(b)*

■ The Gaming Management Agreement contemplates a relationship between Catskill and the Tribe under which Catskill would be primarily responsible for the organization and operation of the casino, and would give the Tribe a portion of the profits. The management agreement required NIGC approval. 25 U.S.C. § 2711(a)(1). Management agreements that do not have NIGC approval are void and unenforceable. 25 C.F.R. § 533.7. The Management Agreement, under which Catskill would earn its gaming profits, was not approved at the time defendant allegedly interfered with the agreement. Thus,

---

**9.** Specifically, defendant contends that: (1) the Land Purchase Agreement required Governor Pataki's concurrence in the BIA approval under 25 U.S.C. § 2719; (2) the Management Agreement required NIGC approval under § 2710 and § 2711; (3) the Mortgage Agreement (in addition to not being executed) required approval under Section 81; (4) the Shared Facilities Agreement required approval under Section 81, and was contingent on

§ 2719 approval; (5) the Development and Construction Agreement required approval under Section 81, and was contingent on approval under § 2719. Furthermore, because the Tribe had no compact in place with the State that allowed for electronic games, defendant argues that the project is economically untenable, and that damages should be limited to lost revenue from the "table games" allowed by the current compact.

there was no valid and enforceable contract with which defendant could interfere.

Catskill argues that this and the other agreements were fully enforceable because the parties agreed to cooperate and to use commercially reasonable best efforts to obtain government approval, so that, even though no government approval was obtained, the contracts are nonetheless enforceable to the extent they require the Mohawks to use good faith efforts to bring about government approval. This contention was expressly rejected in *A.K. Management Co. v. San Manuel Band of Mission Indians*, 789 F.2d 785 (9th Cir.1986), in which the Ninth Circuit explained that the failure to obtain government approval renders the entire agreement invalid, including any "best efforts" clause. The validity of the management agreement (and all agreements collateral to it) is a matter of statutory application—it is not dependent on language used by the parties in the contract.[10]

2. *Plaintiffs' Other Agreements Are Void Under 25 U.S.C. § 2711(a)(3)*

Collateral agreements executed in conjunction with gaming management contracts are included in the definition of management contracts, and thus are also void absent NIGC approval. 25 U.S.C. § 2711(a)(3); 25 C.F.R. § 533.7. A collateral agreement is defined as

> any contract, whether or not in writing, that is related, either directly or indirectly, to a management contract, or to any rights, duties or obligations created between a tribe (or any of its members, entities, or organizations) and a management contractor or subcontractor (or

any person or entity related to a management contractor or subcontractor).

25 C.F.R. § 502.5.

Each of the agreements executed by the parties relates either directly or indirectly to rights or obligations created between the Tribe and Catskill or one of its affiliates under the Management Agreement:

— The Land Purchase and Mortgage Agreements effect the transfer and lease of the Raceway property for the purpose of building and operating the casino. Catskill will be paid for this transfer by profits from the casino, which, under the Management Agreement, Catskill will operate.

— Under the Development and Construction Agreement, Catskill agreed to design, construct and furnish the casino, as well as assist the Tribe in obtaining a loan to pay for the costs of construction of the facility. While this agreement provides no additional compensation to Catskill, the Management Agreement refers to need for Catskill's "expertise, experience and ability to assist the [Tribe] in obtaining financing to construct and develop" the casino and "to manage, operate and maintain" the casino, as well as "to instruct the [Tribe] and others in the operation of a first-class gaming facility." (Carpinello Decl. at Ex. C at 1–2.) The Construction Agreement thus relates directly to Catskill's right and obligations under the Management Agreement.

— Finally, the Shared Facilities Agreement describes the operation of the adjacent racetrack as it relates to the casino, and grants Catskill the right to operate the track facility. It refers explicitly to the Management Agreement and the De-

---

**10.** However, as discussed below, a "best efforts" provision will come into play where a contract is valid; i.e., it does not fall within Section 2711 or any other "automatic invali-

dation" statutory provision, and there are no express conditions precedent to the contract's validity. See supra, section II.C.3.

velopment and Construction Agreement, and is drafted to work in conjunction with those agreements.

I thus find that the Land Purchase Agreement, the Mortgage Agreement, the Shared Facilities Agreement, and the Development and Construction Agreement, are void under Section 2711(a)(3).

3. *Even If Plaintiffs' Other Agreements Are not Void Under § 2711(a)(3), All Except the Land Purchase Agreement Are Not Valid and Enforceable For Other Reasons*

Under the facts of this case, each of the other agreements executed by the parties is a collateral agreement within Section 2711. Assuming, however, these agreements do not fall within the Act's definition of "collateral agreements," all but the Land Purchase Agreement are invalid on other grounds.

a. *Mortgage Agreement*

▮▮▮ Defendant claims that the mortgage agreement was not executed, and plaintiffs do not dispute this contention. The mortgage agreement would have been executed upon the placing of land into trust, an event which had not yet occurred. Thus, as an alternative grounds for invalidity, there is no basis on which I can find that a signed, executed mortgage agreement existed between the parties. Furthermore, as an agreement that encumbers Indian lands for a period of more than seven years, the agreement is invalid without BIA approval under the amended Section 81.

b. *Shared Facilities Agreement*

▮▮▮ The shared facilities agreement, which sets out the terms by which the plaintiffs and the Mohawks were to coordinate operation of the casino facilities, expressly states that it is contingent upon

the conveyance of the subject property to the U.S. in trust as provided for in the Land Purchase Agreement. The conveyance of the land into trust is a condition precedent to the validity of the contract, and it did not occur, thus creating an alternative grounds for its invalidity. *Cauff, Lippman & Co. v. Apogee Finance Group, Inc.,* 807 F.Supp. 1007, 1022 (S.D.N.Y.1992); *Office of the Comptroller General of Republic of Bolivia on Behalf of Bolivian Air Force v. Int'l Promotions & Ventures, Ltd.,* 618 F.Supp. 202, 207 (S.D.N.Y.1985).

c. *Development and Construction Agreement*

▮▮▮ Even if the IGRA does not apply to the Development and Construction Agreement, that agreement must be approved under Section 81. *See United States v. D & J Enterprises,* No. 93–C–233–C, 1993 WL 767689 (W.D.Wis. Dec. 23, 1993) (applying analysis used to evaluate whether management contracts are "relative to Indian lands" to non-management, development and construction agreements).

d. *Land Purchase Agreement*

Defendant argues that the Land Purchase Agreement is also void because the trust transfer had not yet been approved under Section 2719 and Section 81. This is not the case.

Under 25 U.S.C. § 2719, the Secretary of the Interior, with the Governor's concurrence, must approve the application to transfer the land into trust. Without the Governor's concurrence, the approval was not complete. However, nothing in Section 2719 explicitly invalidates contracts to purchase land held in trust where the underlying land-into-trust application has not been approved. Therefore, the Land Pur-

chase Agreement is not invalid under Section 2719.

Section 81 does not apply to the land-into-trust application or the Land Purchase Agreement. Section 81 applies to contracts that are for services relating to Indian lands (pre amendment), or that encumber Indian lands for a period of seven or more years. Plaintiffs are correct that the act of placing land into trust does not fall within either of these definitions. A land-into-trust transaction generally falls under 25 U.S.C. § 465,[11] or, if it relates to gaming, under Section 2719.

Thus, no statutory provision other than Section 2711 acts to invalidate the Land Purchase Agreement.[12] Nonetheless, I have already concluded that the Land Purchase Agreement is void as collateral to the Management Agreement.

Because I find that all of the agreements between Catskill and the Tribe are invalid under Section 2711, plaintiffs' First Cause of Action is dismissed.

### D. Plaintiffs State A Claim For Interference With Prospective Business Relations

A defendant becomes liable for tortious interference with a plaintiff's business relations when four conditions are met: (1) there is a business relationship between the plaintiff and a third party; (2) the defendant, knowing of that relationship, intentionally interferes with it; (3) the defendant acts with the sole purpose of harming the plaintiff, or, failing that level of malice, uses dishonest, unfair, or improper means; and (4) the relationship is injured. *Goldhirsh Group, Inc. v. Alpert*, 107 F.3d 105, 108 (2d Cir.1997). "To state a claim for tortious interference with prospective business relations, a valid contract is not necessary." *See Hannex Corp. v. GMI, Inc.*, 140 F.3d 194, 205 (2d Cir.1998). "[A] plaintiff can recover if that plaintiff can prove that the defendant tortiously interfered with 'a continuing business or other customary relationship not amounting to a formal contract.'" *Id.* (quoting Restatement (Second) of Torts § 766B (1979)).

It is indisputable that plaintiffs had a business relationship with the Mohawks, and the prospect of their jointly exploring a major casino gambling opportunity. Defendant's knowledge of that relationship is also beyond question. The issues here are two: whether plaintiffs have met the "sole purpose or malice" requirement, and whether the relationship was in fact injured.

#### 1. *Plaintiffs Have Adequately Plead Wrongful Means*

If the defendant's interference is intended, at least in part, to advance its own competing interests, the claim will fail unless the means employed were wrongful. Defendant argues for the application of the wrongful means standard enunciated in *PPX Enterprises, Inc., v. Audiofidelity*

---

**11.** Section 465 authorizes the Secretary of the Interior, in his discretion, to acquire "lands, water rights or surface rights" through "purchase, relinquishment, gift, exchange, or assignment... within or without existing reservations, including trust or otherwise restricted allotments." Under regulations passed pursuant to this section, the land attains trust status only after the Secretary has published a notice of intent to take the land into trust pursuant to § 151.6(c)(2), the time period for appeal has run, and all title objections have been cleared, and the BIA approves or issues the appropriate instrument of conveyance.

**12.** The parties did not address whether the trust transfer was an express condition precedent to liability under the contract, or whether the contract is void under its terms for any other reason.

*Enters., Inc.,* 818 F.2d 266, 269 (2d Cir. 1987), where the Second Circuit in dicta limited those means to criminal or fraudulent conduct. However, another panel of the Second Circuit has stated that "this interpretation since has been recognized as unduly narrow and not in accordance with New York law." *Hannex Corp. v. GMI, Inc.,* 140 F.3d 194, 206 n .9 (2d Cir.1998) (noting that the *PPX Enterprises* limitation is no longer binding on the court, inasmuch as the New York Court of Appeals more recently reiterated a broader standard in *NBT Bancorp Inc. v. Fleet/Norstar Fin. Group, Inc.,* 87 N.Y.2d 614, 621, 664 N.E.2d 492, 496, 641 N.Y.S.2d 581, 585 (1996), which reiterated a definition of wrongful means under New York law to include "physical violence, fraud or misrepresentation, civil suits and criminal prosecutions, and some degrees of economic pressure."); *see also Ivy Mar Co., Inc. v. C.R. Seasons Ltd.,* No. 95–CV–0508, 1998 WL 704112, at *16 (E.D.N.Y. Oct. 7, 1998) (recognizing abrogation and holding that dishonesty and unfair means are also sufficient); *but see Gottlieb v. Simon,* 1998 WL 684839, at *3 (S.D.N.Y. 1998) (granting defendant summary judgment after *Hannex* on grounds that plaintiff could not show that defendant's alleged tortious interference was "criminal or fraudulent"); aff'd sub nom. *RKG Holdings, Inc. v. Simon,* 182 F.3d 901 (2d Cir. 1999).

Even under the more stringent standard, plaintiffs can survive the motion to dismiss. Under New York law, fraud is generally defined as the gain of an advantage to another's detriment by deceitful or unfair means. *See* 60 N.Y.Jur.2d Fraud § 1 (1987 & Supp.1999). Plaintiffs have alleged facts from which a juror could conclude that Park Place principals lied about Catskill and the status of the pending regulatory approval to induce the Mohawks to break their agreement with Catskill.

Defendant's argument that plaintiffs have not shown "but for" causation—that is, but for their wrongful conduct the prospective business venture would have come to fruition—is not properly considered on a motion to dismiss, as it involves issues of fact. Plaintiffs clearly state in their complaint that they view Park Place's efforts to become the exclusive operator of any future Mohawk casinos as the reason the Monticello casino was not built.

2. *Plaintiffs' Have Adequately Pled Injury To The Business Relationship*

 The Court has also considered whether Justice Teresi's ruling compels dismissal of this claim on the grounds that Park Place did not directly cause Catskill's losses, such as gambling revenues and development fees, on the casino project.[13]

 Recovery in tort extends to any loss that naturally follows the wrongful act. *Delehanty v. Walzer,* 59 N.Y.S.2d 777 (1945), rev'd on other grounds, 271 A.D. 886, 67 N.Y.S.2d 25, aff'd. 298 N.Y. 820, 83 N.E.2d 863. Under New York law, lost profits are recoverable as an element of damages where they result as the natural and probable consequence of a tortious act. *342 Holding Corp. v. Carlyle Construction Corp.,* 31 A.D.2d 605, 295 N.Y.S.2d 248, 249. *Hughes v. Nationwide Mut. Ins. Co.,* 98 Misc.2d 667, 414 N.Y.S.2d 493 (1979). Lost profits may be recovered if plaintiffs prove them with rea-

---

**13.** The Court first raised the issue of the availability of lost profits or damages with the parties at a pre-trial conference on March 9, 2001. After Judge Teresi issued his opinion, the Court, in an April 25, 2001 letter, invited both parties to comment on the ruling's impact on this lawsuit. Both parties responded by letter on May 2, 2001.

sonable certainty and without speculation. *See Steitz v. Gifford*, 280 N.Y. 15, 20, 19 N.E.2d 661; *Dunlop Tire & Rubber Corp. v. FMC Corp.*, 53 A.D.2d 150, 154–155, 385 N.Y.S.2d 971; *Paduano v. State*, 203 App. Div. 503, 505, 196 N.Y.S. 804; *Veverka v. Spinella*, 60 Misc.2d 529, 303 N.Y.S.2d 305 (1969).

Defendant argues that, because approval of the casino project was by no means an inevitability, Park Place's interference could not be the direct cause of plaintiffs' injuries. Specifically, they argue that any claim for lost profits is too uncertain. They point to Judge Teresi's decision as proof that the project was dependent on a number of remaining contingencies, not the least of which was renegotiation and approval of a valid compact between the Tribe and the State.

Plaintiffs for their part claim that, at the time Park Place allegedly induced the Mohawks to drop Catskill, "all the planets were aligned in Catskill's favor" and "there were no obvious impediments to the successful completion of the Project." (Pl. May 2, 2001 letter at 3, 4).[14] In addition, they argue that Judge Teresi's decision does not make their claims more speculative, because the Tribe was entitled, as a matter of federal law, to conduct Class III gaming on its lands, with or without a compact.

Plaintiffs are correct that, with proper approvals, they would have eventually been allowed to operate video gaming terminals and other Class III gambling activities at the casino, despite the lack of a valid compact with the State. Under the IGRA, a tribe may engage in Class III gaming on tribal lands (including trust lands) in any of three different ways, only one of which appears to have been foreclosed by the *Saratoga* decision. First, they may do so voluntarily, by a compact executed and properly authorized under its respective laws by the tribe and the state (including the state legislature, where required under state law). 25 U.S.C. § 2710(d)(3). Failing this—and it appears here that because of opposition to gambling in the New York State Assembly such efforts likely *will* fail—the Tribe may bring an action against the state under the statutory compact mediation procedures in the IGRA. 25 U.S.C. § 2710(d)(7). If a Tribe sues, a State asserts an Eleventh Amendment sovereign immunity defense, and the action is dismissed on that basis, a Tribe can still conduct Class III gaming pursuant to regulations promulgated by the Department of the Interior in 1999. These regulations mandate that the Secretary shall issue "gaming procedures" which are the legal equivalent of a compact properly authorized by a state or in a court action under IGRA. 25 C.F.R. 291. The goal of these procedures is to provide

**14.** In support of this contention, they point to the following (among other items): (1) all necessary contracts between the parties had been executed (2) the SEQRA process (undefined by the plaintiffs) was fully completed, including all environmental approvals; (3) the BIA had approved the Land to Trust transfer, "subject to the concurrence of the Governor and NIGC approval of the management agreement." the latter of which was "progressing favorably;" (4) the parties had received the NIGC's final comments and NIGC approval "at this stage was a mere formality for documentation compliance;" (5) "the Governor was ready to concur;" (6) the local community was behind the project; and (7) the construction contract was awarded and construction was set to begin immediately subsequent to the expected approvals. (Id.) They also claim that "[t]he evidence will show that the BIA would not have approved the land to Trust transfer had the Governor not indicated his support and willingness to amend the existing compact to add VLTs" (a term which plaintiffs do not define, but which the court believes is a reference to video gaming terminals of some kind). (Id. at 3.)

for Class III gaming operations on tribal lands despite opposition or lack of cooperation from the state. For instance, the Mashantuckett Pequot Foxwoods casino in Connecticut has operated under such procedures prescribed by the Secretary since its inception. *Mashantucket Pequot Tribe v. State of Connecticut,* 737 F.Supp. 169, aff'd. 917 F.2d 1024 (2d Cir.1990). Thus, defendants incorrectly characterize Catskill's claim that it would have obtained government approval of the casino as "purely speculative."

Nevertheless, the above-described processes do take time. Regardless of whether the Tribe had to renegotiate the compact, bring suit to force those negotiations, or bypass the State in the form of DO authorization, much work remained, and there would appear to be no way to estimate the timetable for completion. I thus find it hard to see how plaintiffs will be able to prove that Park Place's actions were the proximate cause of future lost profits.

However, whether or plaintiffs can show that their losses on this venture stemmed directly (and not as the result of any intervening causes) from Park Place's actions is a question of fact, which is not properly decided on a motion to dismiss. Plaintiffs should be allowed to submit evidence on any damages that they are claiming flowed naturally and probably from defendant's alleged interference, and the subsequent termination of the Mohawk's relationship with Catskill. In addition, some of plaintiffs' potential profits from this project (e.g., any profits derived from Class II gaming operations) were not necessarily dependent on successful negotiation of a compact with the state. While those profits may be unduly speculative for other reasons, I leave this and any other analysis of damages for the parties' post-discovery motions.

3. *The Noerr–Pennington Doctrine Does Not Apply To Defendant's Actions*

Park Place also argues that it is immune from liability under the *Noerr–Pennington* doctrine. Defendant is incorrect.

The *Noerr–Pennington* doctrine provides immunity from liability under the antitrust laws and other tort laws for conduct seeking to influence government action. *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.,* 365 U.S. 127, 136, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers of America v. Pennington,* 381 U.S. 657, 669–70, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965). Under this doctrine, the Supreme Court has stated that "the Sherman Act does not prohibit two or more persons from associating together in an attempt to persuade the legislature or the executive to take particular action with respect to a law that would produce a restraint or a monopoly." *Noerr,* 365 U.S. at 136, 81 S.Ct. at 529. This immunity applies to lobbying or petitioning in an effort to obtain an exclusive arrangement with a governing body, such as a franchise or license. *See, e.g., Metro Cable Co. v. CATV of Rockford, Inc.,* 516 F.2d 220 (7th Cir.1975) (applying doctrine to petitioning of municipal government for cable franchise); *Video International Production, Inc., v. Warner–Amex Cable Communications, Inc.,* 858 F.2d 1075 (5th Cir.1988) (applying doctrine to petitioning for favorable interpretation of zoning codes so as to preclude competition).

Defendant argues that *Noerr–Pennington* applies to it because plaintiffs' action is based on Park Place's alleged attempt to obtain a contractual relationship with the Tribe, which is recognized under federal law as a sovereign governmental entity. Even assuming that the April 14, 2000 agreement was made with a

governmental entity (which is by no means clear, see supra section I.F.), defendant's invocation of the doctrine can not stand.

As plaintiffs correctly argue, the *Noerr–Pennington* doctrine is inapplicable when parties are "engaged in private commercial activity, no element of which involved seeking to procure the passage or enforcement of laws." *Con't Ore Co. v. Union Carbide & Carbon Corp.*, 370 U.S. 690, 82 S.Ct. 1404, 8 L.Ed.2d 777 (1962). This is because the doctrine "is founded upon the individual's constitutional right of petition under the First Amendment and upon the corresponding concern that the representatives in the legislatures retain access to the opinions of their constituents, unhampered by collateral regulation." *Hunt v. Mobil Oil Corp.*, 410 F.Supp. 10, 20 (S.D.N.Y.1975) (recognizing the Supreme Court's exclusion of commercial activity from the doctrine). Park Place was not "lobbying"—it did not seek to influence the Mohawks to pass new laws or to enforce laws ·in a particular way. Rather, it entered into a purely commercial relationship with the Mohawks.

Defendant's motion to dismiss plaintiffs' Second Cause of Action is denied.

### E. Unfair Competition

 An unfair competition claim under New York law is very similar to a claim of unfair competition under Section 43(a) of the Lanham Act. *Kregos v. Associated Press*, 795 F.Supp. 1325, 1336 (S.D.N.Y. 1992), aff'd, 3 F.3d 656 (2d Cir.1993), *cert. denied*, 510 U.S. 1112, 114 S.Ct. 1056, 127 L.Ed.2d 376 (1994). "[T]he essence of unfair competition under New York common law is the bad faith misappropriation of the labors and expenditures of another, likely to cause confusion or to deceive purchasers as to the origin of the goods." *Rosenfeld v. W.B. Saunders*, 728 F.Supp. 236, 249–50 (S.D.N.Y.) (quoting *Computer Assocs.*

*Int'l, Inc. v. Computer Automation, Inc.*, 678 F.Supp. 424, 429 (S.D.N.Y.1987), aff'd, 923 F.2d 845 (2d Cir.1990)). The plaintiff must show either actual confusion in an action for damages or a likelihood of confusion for equitable relief. *See W.W.W. Pharmaceutical Co. v. Gillette Co.*, 984 F.2d 567, 576 (2d Cir.1993) (citation omitted). Additionally, there must be some showing of bad faith. *See Saratoga Vichy Spring Co. v. Lehman*, 625 F.2d 1037, 1044 (2d Cir.1980).

 The facts· of this case do not sound in a claim for unfair competition. Plaintiffs have not alleged that defendant, in attempting to obtain the Mohawk's business, tried to pass itself off as the plaintiffs, or to misappropriate any of the plaintiffs' property. *See Randa Corp. v. Mulberry Thai Silk, Inc.*, 2000 WL 1741680 at *3 (S.D.N.Y. Nov. 27, 2000). Quite the opposite, in fact—the ostensible reason for the Mohawk's decision to switch to Park Place was because defendant was *not* Catskill.

Plaintiffs' Third Cause of Action is dismissed.

### F. Donnelly Act Claims

The Donnelly Act provides, in pertinent part:

Every contract,· agreement, arrangement or combination whereby[:]

A monopoly in the conduct of any business, trade, or commerce or in the furnishing of any service in this state, is or may be established or maintained, or whereby

Competition or the free exercise of any activity in the conduct of any business, trade or commerce or in the furnishing of any service in [New York] state is or may be restrained or whereby

For the purpose of establishing or maintaining any such monopoly or unlawfully

interfering with the free exercise of any activity in the conduct of any business, trade, or commerce or in the furnishing of any service in this state any business, trade or commerce or the furnishing of any service is or may be restrained, is hereby declared to be against public policy; illegal and void.

19 Consol. N.Y. Gen. Bus. Law § 340 (McKinney's 2001).

The Donnelly Act is patterned after the Sherman Antitrust Act, and is generally interpreted consistently with federal antitrust law under the Sherman Act. *Empire Volkswagen Inc. v. World–Wide Volkswagen Corp.,* 814 F.2d 90, 98 n. 4 (2d Cir.1987); *see also Kramer v. Pollock–Krasner Found.,* 890 F.Supp. 250, 254 (S.D.N.Y.1995) (the Donnelly Act is modeled on the Sherman Act and is construed in light of federal precedent); *Anheuser–Busch, Inc. v. Abrams,* 71 N.Y.2d 327, 335, 525 N.Y.S.2d 816, 820, 520 N.E.2d 535 (1988).

To assert a claim under the Donnelly Act, a plaintiff must: (1) identify the relevant market; (2) describe the nature and effects of the purported conspiracy; (3) describe how the economic impact of the conspiracy restrains trade in the market in question; and (4) identify a conspiracy or reciprocal relationship between two or more parties. *Creative Trading Co., Inc. v. Larkin–Pluznick–Larkin, Inc.,* 136 A.D.2d 461, 462, 523 N.Y.S.2d 102, 103 (1st Dept.1988). *See also Newsday, Inc. v. Fantastic Mind, Inc.,* 237 A.D.2d 497, 497, 655 N.Y.S.2d 583, 584 (2d Dep't 1997); *Shepard Indus., Inc. v. 135 East 57th St. LLC,* 1999 WL 728641, at *3 (S.D.N.Y. 1999).

Dismissals at the pleading stage of an antitrust claim prior to giving the plaintiff ample opportunity for discovery should be granted very sparingly. *Hospi-tal Building Co. v. Trustees of the Rex Hospital,* 425 U.S. 738, 746, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976). Nevertheless, conclusory allegations which merely recite the litany of antitrust will not suffice. *John's Insulation, Inc. v. Siska Constr. Co.,* 774 F.Supp. 156, 163 (S.D.N.Y.1991) "This court retains the power to insist upon some specificity in pleading before allowing a potentially massive factual controversy to proceed." *Id.* (citing *Assoc. General Contractors of Calif., Inc. v. Calif. State Council of Carpenters,* 459 U.S. 519, 528 n. 17, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983)). At a minimum, plaintiffs' allegations must cover all the elements that comprise the theory for relief. *Valley Disposal, Inc. v. Central Vermont Solid Waste Management Dist.,* 31 F.3d 89, 95 (2d Cir.1994) (citations omitted).

Defendant argues first that plaintiffs have failed to identify a relevant market. For antitrust purposes, a relevant market consists of both a product market—those commodities or services that are reasonably interchangeable, and a geographic market—the area in which such reasonable interchangeability occurs. *Pyramid Co. of Rockland v. Mautner,* 153 Misc.2d 458, 463, 581 N.Y.S.2d 562 (N.Y.Sup.1992)(citing *Brown Shoe Co. v. United States,* 370 U.S. 294, 82 S.Ct. 1502, 8 L.Ed.2d 510 (1962)). The plaintiff must explain "why the market it alleges is in fact the relevant, economically significant product market." *Re–Alco Industries, Inc. v. National Center for Health Educ. Inc.,* 812 F.Supp. 387, 391 (S.D.N.Y.1993).

The complaint alleges that defendant restrained competition "in the furnishing of gaming services in New York." Plaintiffs have thus clearly identified the geographical market as the state of New York. However, the allegation potentially describes two product markets to which the plaintiff may be referring: (1) provid-

ing casino gaming to gaming customers who currently travel outside New York for the same services, and (2) providing casino gaming development, management and related services to Indian tribes seeking to establish casinos on their lands. It is not clear from the complaint from which market plaintiffs claim they have been excluded.

Plaintiffs have also failed to allege with specificity how Park Place's arrangement with the Mohawks acts to restrain competition within either market. A complaint for a violation under the Donnelly Act must allege anticompetitive effects. *Hsing Chow v. Union Cent. Life Ins. Co.,* 457 F.Supp. 1303, 1306–7 (E.D.N.Y.1978 ) (finding that plaintiff's allegation that she had been put out of business did not suffice to show anti-competitive effects in the industry flowing from her termination). The market for Indian gaming is already competitively limited by its nature—only Indian tribes may legally conduct gaming operations, and any gaming activities are heavily regulated under both Federal law and the terms of Tribal–State compact. Plaintiffs have alleged no facts which support why plaintiffs should be allowed to build a casino while Park Place should not. And at present, under Judge Teresi's ruling, no gaming project (including, quite possibly, the ones already up and running [15]) is legal, because the IGRA requires formation of a compact and the existing compacts have been invalidated.

Plaintiffs' Fourth Cause of Action is dismissed.

## CONCLUSION

Plaintiffs' First, Third and Fourth Causes of Action are dismissed.

This constitutes the order and decision of the Court.

---

**15.** The Court is aware that the Attorney General of the State of New York has stated publicly that existing facilities, including Akwesasne, are not affected by Judge Teresi's ruling. *See* Michael Gormley, "State Says Existing Casinos not Threatened in Indian Gambling Decision," Associated Press, April 20, 2001.